Frank DUPERIER, Individually, and Howard, Weil, Labouisse, Friedrichs, Inc., Appellants,

v.

TEXAS STATE BANK, Appellee.

No. 13–97–756–CV.

Court of Appeals of Texas, Corpus Christi.

Aug. 24, 2000.

Edmundo O. Ramirez, Cynthia G. Gutierrez, Ellis, Koeneke & Ramirez, McAllen, Charles W. Lane, III, Thomas K. Potter, III, Jones, Walker, Waechter, Poltevent, Carrere & Denegre, New Orleans, for Appellants.

Morris Atlas, Charles C. Murray, Lisa D. Powell, Atlas & Hall, McAllen, for Appellee.

Before Justices DORSEY, HINOJOSA and RODRIGUEZ.

## OPINION

Opinion by Justice HINOJOSA.

Appellee, Texas State Bank, ("the Bank") on its own behalf and on behalf of certain trust customers of the Bank, sued appellants, Frank Duperier ("Duperier"), individually, and Howard, Weil, Labouisse, Friedrichs, Inc. ("Howard Weil"), alleging Texas Securities Act ("the Act") violations and fraud. After a jury trial, the Bank elected recovery under the Act. Appellants filed this appeal after the trial court rendered judgment against them for damages and recission resulting from the Bank's purchase of notes issued by the International Bank for Reconstruction and Development (the "World Bank").

In the judgment, the trial court awarded the Bank $1,198,341.75, plus $1,707,044.60 in prejudgment interest for notes which the Bank sold prior to trial. For the notes which the Bank held on the date of the judgment, the Bank was to deliver the notes, worth $3,515,000.00, to appellants and to recover from them $3,356,825.00, plus $2,258,069.47 in prejudgment interest. If the notes held by the Bank matured before payment became due under the judgment, the Bank was to recover $3,356,825.00, plus $2,258,069.47 in prejudgment interest, less the $3,515,000.00 value of the matured notes. The court also awarded the Bank $285,000 in attorney's fees, plus contingent attorney fees to cover the costs of appeals.

Appellants raise ten issues for our review. We modify the judgment and, as modified, affirm.

### A. THE MOVE TO A UNIFIED EUROPEAN CURRENCY

In 1978, Germany formed the European Monetary System ("EMS") in order to stabilize currency-exchange rates throughout Europe. The European Council Monetary Committee ("EC") monitored the EMS. The EMS developed the European Rate Mechanism ("ERM") to measure exchange rate volatility. Under rules established by the ERM, the parity of each member's currency was fixed to a weighted overall European Currency Unit, and a limit was set to control how much each currency could fluctuate against the others. There

were two bands within which the currencies could fluctuate: (1) the broad band of +/6%, which was applied to Spain and Portugal; and (2) the narrow band of +/2.25%, which was applied to all other ERM members. When a currency reached the lower limits of its band, the national central banks of the other ERM currencies were obligated to intervene—to prop up the weak currency—by buying that currency on the open market. Spain and Germany were ERM members.

The first four years of the ERM brought seven realignments due to severe depreciation by member currencies. A realignment occurred when the government of a weak currency pro-actively devalued its currency.

In December 1991, the EC finalized and began soliciting ratification of the Maestricht Treaty (the "Treaty"), which was designed to bring all EC member currencies into alignment for an eventual issuance of one European central monetary unit. The Treaty had to be approved by all twelve EC members. The treaty increased the confidence that measures to produce economic convergence would be implemented throughout Europe, which in turn helped maintain stability within the ERM.

Also in December 1991, the Bundesbank, Germany's central bank, raised the discount rate to 8%, the highest level since World War II. After this action, other European governments, including Spain, raised interest rates to show their commitment to the ERM. In June 1992, Denmark rejected the Treaty, throwing the EC into a political crisis on how to resolve the situation. Shortly thereafter, France announced a September referendum on the Treaty.

On July 16, 1992, the Bundesbank, reacting to a growing money supply, raised the discount rate to 8.75%. This hike in the central discount rate placed a strain on the other European countries which were experiencing slower growth.

### B. THE WORLD BANK NOTES

During the summer of 1992, the World Bank issued $100 million in dual-index-structured notes for sale to investors. The underwriter for this issue was the First Boston Corporation ("First Boston"). The prospectus, drafted by First Boston, showed that the notes paid interest from August 7, 1992, semiannually on February 7 and August 7 of each year. The notes had a five-year term and matured on August 7, 1997. The first interest payment was due on February 7, 1993. The interest rate for the initial interest period, August 7, 1992 to February 7, 1993, was 9% per annum. The interest rate for each remaining interest period was described in the prospectus as:

> the sum of two components: a specified "Coupon Base", which increases annually, and a variable "Exchange Rate Adjustment" which changes semiannually with the Spanish peseta/Deutsche mark exchange rate. The interest rate will be determined as described herein two Determination Business Days before the beginning of each such Interest Period. The interest rate on the Notes may not exceed 24% per annum or be less than 0% per annum for any Interest Period.

On its second page, the prospectus stated:

### IMPORTANT INFORMATION

As described herein, changes in the exchange rate of the Spanish peseta relative to the Deutsche mark will affect the interest rate applicable to the Notes. Such changes may be significant. The rate of interest on the Notes will be positively affected by the appreciation of the Spanish peseta relative to the Deutsche mark and negatively affected by the appreciation of the Deutsche mark relative to the Spanish peseta.

Based upon the prospectus, the initial 9% interest rate would readjust, up or down, depending on the relationship between the

Deutsche mark (the "D-mark") and the peseta. The interest rate would increase if the peseta appreciated in relation to the D-mark and would decrease if the peseta was devalued against the D-mark. At maturity, the investor's principal would be returned in full. Moody's rated the notes "Triple A" as to principal only.

On August 7, 1992, Frank Duperier, a bond salesman for Howard Weil, sold $12 million of these bonds to the Bank, $7 million to the trust department and $5 million to the banking department. On September 13, 1992, the EC executed the first realignment of the ERM in five years by devaluing the Italian lira by 7%. Three days later, the British pound sterling and the lira dropped by 11.2% and 18.1%, respectively. Both governments ceased participation in the ERM. This caused speculators to turn to the French franc, Irish pound, and Spanish peseta. Ireland and Spain immediately reacted to the speculators by instituting foreign exchange controls to protect their currency. Despite the controls, Spain could not support its currency and on September 16, 1992, the peseta was devalued by 5%. On November 22, 1992, the peseta was devalued by another 6%. These devaluations caused the interest rate paid on the notes to fall to zero after the expiration of the initial six-month guaranteed rate of 9% per annum. This deprived the Bank of interest income from the notes. The interest-rate collapse also caused the price of the notes to fall. The Bank sold some of the notes on various dates from December 1992 to December 1996 at prices ranging from 74% of par on the initial sale to 94% of par on the final sale.

The Bank, on its own behalf and on behalf of certain customers of the trust department, sued appellants, alleging that Duperier, in the course and scope of his employment with Howard Weil, made certain misrepresentations and omissions about the notes prior to the bank's purchase. The alleged misrepresentations are:

(1) Howard Weil had investigated this issue of notes very carefully. Specifically, Duperier stated that Howard Weil had done more due diligence on this issue than he was aware it had done on any other issue.

(2) The notes were a safe and suitable investment for the Bank and its trust department.

(3) There was no realistic chance the yield on the notes would fall to zero.

Alleged omissions include:

(1) The European political climate, the proposed union, and the ERM were increasingly unstable. In particular, Duperier did not inform the Bank of the repercussions from the Danish rejection of the Treaty.[1]

(2) Spanish equity and bond markets were in a tailspin and the peseta was overvalued.

(3) Some analysts believed a realignment of the ERM was imminent.

(4) The yield curve, as of August 7, 1992, showed the World Bank notes would be paying no interest before the maturity date.

(5) First Boston was willing to take a loss to encourage the sale of the bonds by offering Howard Weil one-half percentage point in commissions.

According to the Bank, Duperier's conduct, as reflected by these misrepresentations and omissions, violated the Act because he offered and sold securities to the Bank by means of untrue statements of material fact, as well as omissions of material facts necessary to make the statements made not misleading.

1. Denmark rejected the Treaty in June 1992. The Bank purchased the bonds from Duperier on August 7, 1992.

## C. THE TEXAS SECURITIES ACT

The Act establishes a cause of action for misrepresentations or omissions in connection with a securities transaction. The relevant portion of the act states:

**Art. 581–33. Civil Liabilities**

A. Liability of Sellers.

> (2) Untruth or Omission. A person who offers or sells a security (whether or not the security or transaction is exempt under Section 5 or 6 of this Act) by means of an untrue statement of material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, is liable to the person buying the security from him, who may sue either at law or in equity for recission, or for damages if the buyer no longer owns the security. However, a person is not liable if he sustains the burden of proof that either (a) the buyer knew of the untruth or omission or (b) he (the offeror or seller) did not know, and in the exercise of reasonable care could not have known, of the untruth or omission. The issuer of the security (other than a government issuer identified in Section 5M) is not entitled to the defense in clause (b) with respect to an untruth or omission (i) in a prospectus required in connection with a registration statement under Section 7A, 7B, or 7C, or (ii) in a writing prepared and delivered by the issuer in the sale of a security.

TEX.REV.CIV. STAT. ANN. art. 581–33(A)(2) (Vernon Supp.2000). Thus, in order to recover under the Act, the Bank had to prove that appellants made an offer or sale of a security by means of either (1) an untrue statement of material fact or (2) an omission of a material fact which was necessary in order to make the statement made not misleading. *See Anderson v. Vinson Exploration, Inc.,* 832 S.W.2d 657, 661–62 (Tex.App.—El Paso 1992, writ denied). An omission or misrepresentation is material if there is a substantial likelihood that proper disclosure would have been viewed by a reasonable investor as significantly altering the total mix of information made available. *Anheuser–Busch Co., Inc. v. Summit Coffee Co.,* 858 S.W.2d 928, 936 (Tex.App.—Dallas 1993, writ denied), *vacated by* 514 U.S. 1001, 115 S.Ct. 1309, 131 L.Ed.2d 192 (1995) (remanded for reconsideration in light of *Gustafson v. Alloyd Co. Inc.,* 513 U.S. 561, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995)), *on remand,* 934 S.W.2d 705 (Tex.App.—Dallas 1996, writ dism'd by agr.) (disposing of case in same manner as original appeal). In other words, the issue is whether a reasonable investor would consider the information important in deciding whether to invest. *Weatherly v. Deloitte & Touche,* 905 S.W.2d 642, 649 (Tex.App.—Houston [14th Dist.] 1995, writ dism'd w.o.j.). The investor has no duty of due diligence; the statute merely requires proof of a misrepresentation or omission by the seller. TEX. REV.CIV. STAT. ANN. art. 581–33(A)(2) (Vernon Supp.1999); *see Summers v. Well-Tech, Inc.,* 935 S.W.2d 228, 234 (Tex. App.—Houston [1st Dist.] 1996, no writ). It is no defense that the investor could have discovered the truth by exercising ordinary care. *Summers,* 935 S.W.2d at 234.

## D. SUFFICIENCY OF THE EVIDENCE

In their second issue, appellants complain the evidence is legally and/or factually insufficient to prove that Howard Weil made any material misrepresentation because any statements made were true at the time they were made. Appellants further claim the evidence is legally and/or factually insufficient to establish that Howard Weil made a material omission because

Duperier did not know[2] of the matters the Bank claims were not disclosed. In their third issue, appellants question whether the Bank, as a sophisticated investor, was chargeable with knowledge of the omitted information.

Special Question No. 1 asked the jury "Did the defendants violate the Texas Securities Act in the sale of the World Bank Notes to Texas State Bank?" In connection with this question, the trial court instructed the jury that:

> A person or entity violates the Texas Securities Act by offering or selling a security by means of either:
>
> (a) an untrue statement of material fact; or
>
> (b) an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading.

A prediction in connection with the sale of a security may constitute an untrue statement of a material fact if:

> (a) the speaker does not genuinely believe the statement is accurate;
>
> (b) there is no reasonable basis for the speaker's belief that the statement is accurate; or
>
> (c) the speaker is aware of any undisclosed facts that would tend seriously to undermine the accuracy of the statement.

The charge further instructed the jury that:

> A fact is "material" if there is a substantial likelihood that it would have assumed actual significance in the deliberations of a reasonable investor, in that it would have been viewed by the reasonable investor as significantly altering the total mix of information made available.

No violation of the Texas Securities Act occurred if Howard Weil has proved by a preponderance of the evidence that: Texas State Bank at the time of the offer or sale knew of each of the untruths or omissions, if any, which violated the Texas Securities Act; or if the defendants did not know, and in the exercise of reasonable care could not have known, of any such untruths or omissions.

The jury answered "Yes" to this question. The charge did not ask the jury to find that appellants had made a specific misrepresentation or omission under the Act.

When we review the legal sufficiency of the evidence, we consider only the evidence and reasonable inferences therefrom which tend to support the jury findings. *Redman Homes. Inc. v. Ivy,* 920 S.W.2d 664, 667 (Tex.1996); *Responsive Terminal Sys., Inc. v. Boy Scouts of Am.,* 774 S.W.2d 666, 668 (Tex.1989); *City of Alamo v. Casas,* 960 S.W.2d 240, 248–49 (Tex. App.—Corpus Christi 1997, pet. denied). A legal sufficiency challenge should be sustained only when the record shows that: (1) there is a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence conclusively established the opposite of a vital fact. *Cecil v. Smith,* 804 S.W.2d 509, 510 n. 2 (Tex.1991); *Casas,* 960 S.W.2d at 249. Anything more than a scintilla of evidence is legally sufficient to support the jury findings. *Formosa Plastics Corp. USA v. Presidio Eng'r and Contractors, Inc.,* 960 S.W.2d 41, 48 (Tex.1998); *Stafford v. Stafford,* 726 S.W.2d 14, 16 (Tex.1987).

When we review the factual sufficiency of the evidence, we consider, weigh, and

---

**2.** Appellants include the word "knowingly" in this complaint and then insert a footnote saying that they are also complaining of the trial court's abuse of discretion by not including a proper jury instruction on their due diligence defense. Because appellants cite no authority and offer no explanation for their claim of error, we consider the matter waived. Tex. R.App. P. 38.1.

examine all of the evidence which supports or undermines the jury's finding. *Plas–Tex, Inc. v. United States Steel Corp.*, 772 S.W.2d 442, 445 (Tex.1989). We review the evidence, keeping in mind that it is the jury's role, not ours, to judge the credibility of the evidence, to assign the weight to be given to testimony, and to resolve inconsistencies within or conflicts among the witnesses' testimony. *Corpus Christi Teachers Credit Union v. Hernandez*, 814 S.W.2d 195, 197 (Tex.App.—San Antonio 1991, no writ). We set aside the verdict only when we find that the evidence, standing alone, is too weak to support the finding or that the finding is so against the overwhelming weight of the evidence that it is manifestly unjust and clearly wrong. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965).

### 1. *Background*

Carlos Garza, a certified public accountant, headed the trust department at the Bank. As part of his duties, Garza analyzed investment options and bought securities for the trust accounts. Because the Bank did not have an in-house research department, he relied on outside sources and brokers for analysis of the securities. The Bank had a conservative investment philosophy, and Garza bought many U.S. government agency and treasury securities that carried a certain minimal risk. The securities paid a fixed interest rate.

Sometime in 1988, Glen Roney, the Bank's president, introduced Garza to Duperier, a bond salesman for Howard Weil. Garza began buying securities from Duperier. Although Garza had investment experience, he relied on Duperier's advice and recommendations when buying securities for the fixed-income portion of the trust department's bond portfolio. Eventually, Garza made over ninety percent of his securities transactions through Duperier and Howard Weil.

In 1991, Duperier introduced Garza to the concept of dual-index bonds called "Li-bor bonds." The Libor (London inter-banking offering rate) was an interest rate set in six different currency denominations. Libor bonds paid a variable interest rate, which was adjusted based on movements in the index of one interest rate as compared to another interest rate. Duperier advised Garza that these bonds were safe and suitable. Garza bought at least $11.5 million worth of Libor bonds issued by the Federal National Mortgage Association ("Fannie Mae") and the Student Loan Marketing Association ("Sallie Mae"). The interest rate on the Fannie Mae bonds was based on the relationship between the D-mark Libor rate versus the U.S. dollar Libor rate. The interest rate on the Sallie Mae bonds was based on the relationship between the Swiss franc Libor rate versus the U.S. dollar Libor rate. The Libor bonds were stable, and the Bank was satisfied with them.

In the summer of 1992, Duperier and Garza discussed the World Bank notes. Duperier gave Garza a prospectus and some other written materials about the notes. Duperier did not advise Garza to do research on the notes, and indeed, according to Duperier, did not expect Garza and the Bank to redo the research already done by himself, Howard Weil, and First Boston. Garza relied on Duperier and Howard Weil for the research. Before buying the notes, however, Garza read the prospectus and the other material Duperier had provided. During the trial, the Bank's counsel asked Garza what Duperier had told him about the notes. Garza testified:

> He [Duperier] again said they [the notes] were, *in his opinion*, more stable, . . . safer and more stable, less volatile than the Libors. And probably more important than that, the biggest representation he made to me was that he had done more due diligence, that he and the firm [Howard Weil] had done more due diligence, in other words, more homework on these bonds than on any other bond or any other issue that

Howard Weil had ever been involved with. So based on the fact that we'd had a favorable experience so far with the other bonds, these are being touted and represented as being safer, less volatile, the firm has done much homework, much more due diligence than on any other, it gave me certainly a lot of comfort that he was feeling very enthusiastic and very strong about the bonds. (Emphasis added.)

The prospectus stated that the initial 9% interest rate paid on the notes could fall to zero. Garza testified he knew from the prospectus that the interest rate on the notes could fall to zero. When asked why he decided to buy the notes with this knowledge, Garza replied:

We were relying on Frank's research and advice and recommendation and his assessment as to the possibility that they [the notes] could go to zero.

\* \* \* \* \*

[H]is assessment was that there was almost no chance that these bonds would go to zero. And I think that is supported by the fact that he goes through all these scenarios and worse case scenarios and assuming certain devaluations in the currency. He felt and represented to us that there was almost no chance that these bonds would go to zero even though the prospectus does say that there is that possibility.

Garza regarded Duperier's statement that "there was almost no chance" the interest rate would drop to zero as a conclusion of Duperier's due diligence. Garza testified that Duperier's statement was not a performance guarantee, and Garza did not regard the statement as a performance guarantee.

One advantage of the notes was that they allowed for a high current yield of 9% per annum. Garza wanted to earn a slightly enhanced yield over the 5.56% yield paid on fixed-rate U.S. Treasury securities. His testimony indicated that in order to get a higher yield, he would have to accept higher risk as it pertained to the interest rate. As stated previously, there was no principal risk on the notes. After maturity, the Bank could redeem the notes dollar for dollar.

Garza briefed Roney and George Carruthers, executive vice president and chief financial officer of the Bank, about the notes. Garza told them of Duperier's representations and that Duperier had recommended the notes. On August 7, 1992, the Bank bought $5 million worth of these notes for its own account and $7 million worth for its trust department. When the Bank bought the notes, Garza deemed them appropriate investments for the trust department.

## 2. *Analysis*

■ The Bank first contends Duperier made a misrepresentation when he claimed Howard Weil had done more due diligence on this note than on any other. After reviewing the record, however, we conclude there is no evidence to prove this statement was untrue.

Lee Bowman, the Bank's expert, testified that Howard Weil had not done enough due diligence on the note prior to the sale. He said that Howard Weil's due diligence "fell far short in this particular security" and that Howard Weil's due diligence may have been adequate to sell a municipal bond or corporate bond, but not for currency-based bonds. He testified that for "esoteric securities [like the World Bank notes] you need to really spend extensive time researching." While this testimony indicates Howard Weil's due diligence may have been lacking, it does not controvert Duperier's statement that Howard Weil performed more due diligence on these notes than on any others. There is no evidence comparing the amount of due diligence performed on these notes with that performed for other notes. Thus, the Bank did not prove Duperier's statement regarding due diligence was a misrepresentation.

■ The Bank also contends Duperier made misrepresentations when he stated the notes were a safe and suitable investment and that there was no realistic chance the yield on the notes would fall to zero. The evidence reflects that Duperier actually described the notes as safer than the Libor notes which did not have the "step up" in the coupons or the collar provided by the ERM. Duperier also testified the similarity of the notes and the Libor notes, which the Bank liked, led him to believe they were suitable for the Bank's investment purposes. Based on his due diligence, Duperier believed there was virtually no chance the interest rate would reset to zero during the term of the notes.

■ Garza testified that Duperier's statements were his opinions and that Garza did not take them as performance guarantees. A pure expression of opinion will not support an action for fraud. *Trenholm v. Ratcliff,* 646 S.W.2d 927, 930 (Tex. 1983); *see Transport Ins. Co. v. Faircloth,* 898 S.W.2d 269, 276 (Tex.1995). Whether a statement is an actionable statement of "fact" or merely one of "opinion" often depends on the circumstances in which the speaker made the statement. *Transport Ins. Co.,* 898 S.W.2d at 276. Among the relevant circumstances are the statement's specificity, the speaker's knowledge, the comparative levels of the speaker's and the hearer's knowledge, and whether the statement related to the present or the future. *Id.*

Duperier's statements of safety and suitability are not fact specific. Instead, the statements are Duperier's attempts to compare the notes to his knowledge of the Bank's past investments, such as the Libor notes, and to its investment philosophy. As to his "virtually no chance" representation, Duperier was merely providing his assessment for the future of the notes based on the information he possessed at the time. When introduced to these notes, Duperier was not overly familiar with their mechanics or even where to find information about their progress. His knowledge of the notes was derived from the prospectus and other documents provided by First Boston, as well as phone conversations with representatives from that institution. Duperier admitted that he did not investigate the European currency situation beyond the information provided by First Boston. Garza's information was derived from essentially the same sources. We conclude these statements were opinions and not misrepresentations of fact actionable in and of themselves under the Act.

■ The Bank's remaining allegations, brought pursuant to the Act, contend that appellants omitted material information about instability in Europe, the yield curves and calculations of future currency values, the overvaluation of the peseta, and the commission paid to Howard Weil. When Duperier's opinions, as discussed above, are considered in light of these omissions, we conclude there is sufficient evidence to support the jury's verdict.

Garza testified that Duperier did not inform him that: (1) Denmark's rejection of the Treaty could cause an ERM realignment; (2) Spain's bond markets were in a tailspin; (3) a realignment of the ERM was imminent; (4) the peseta was the most overvalued currency against the D-mark by some 12%; and (5) First Boston was willing to pay Howard Weil one-fourth of a percent more than First Boston was earning to issue the notes. Garza further testified that had he known:

> there was pressure in the exchange rate between the peseta and the Deutsche mark and that there would be a possible re-alignment, I would never have considered the bonds. Everything that was presented to me by Frank Duperier and Howard Weil was to the contrary. Everything was supporting a stable exchange rate between the two currencies. But had I known—and that is what gave me comfort in buying the bonds, but had I known that there was pressure against the currency I wouldn't have considered it.

Garza's testimony shows that had he known at least some people were predicting an imminent realignment, he would have probably not bought these particular notes.

In addition to his testimony concerning appellants' inadequate due diligence, Bowman, the Bank's expert, testified that the devaluation of the peseta was foreseeable. He based this conclusion on information published prior to the time the Bank bought the notes. National Westminster Bank, a European financial institution, performed a study of European currency valuations. The results were published in the August 1, 1992 edition of *The Economist,* a British publication dealing in securities and foreign currencies. The study showed that the peseta was the most overvalued currency in Europe. Bowman testified that the peseta's overvaluation was related to the notes in a "very negative way" because, if the peseta was the most overvalued currency in comparison to the D-mark, this left much room for the peseta to decline in value against the D-mark. Bowman opined this information was material to anyone deciding whether to invest in these notes or to do due diligence on them. *The Economist* article also stated that in the recent weeks speculation was mounting of an imminent realignment of the ERM, the first since January 1987. Although the article referred to "speculation", Bowman believed this information was important to anyone doing due diligence on the bonds, or to someone deciding whether to buy them.

Bowman testified the "key point of the sales pitch was that the currencies can't get outside these [ERM] bands." The ERM bands were the ranges in which the currencies could fluctuate. He referred to the June 13, 1992 edition of *The Economist,* which included an article pointing out that the chances of realignment were less remote than when the European Monetary Union was still firmly on track. Bowman thought this information was material to an investor considering whether to buy the bonds. The article also states that after Denmark rejected the Treaty on June 2, 1992, bond dealers were urging their clients to dump certain bonds and that Spanish bonds were the hardest hit by the response to this suggestion.

Bowman also referenced the June 24, 1992, edition of the *Financial Times,* London's equivalent to the *Wall Street Journal.* This publication included an article which explained the adverse effects that Denmark's rejection had on Spain. The article states, in part:

The Danish referendum of June 2 may well help the Spanish government to bring home to the country the fact that it is not the complete master of its own destiny.

The vote rejected the changes to the European community's "constitution", the Treaty of Rome, decided last December in Maestricht, and sent Spain's equity and bond markets into a tailspin.

Bowman explained that this article meant confidence in the peseta was "breaking down," and, therefore, the peseta would decline in value against the D-mark.

Bowman considered yield curves for the peseta and the D-mark, as they existed on the date of purchase, absolutely essential in analyzing the notes. A yield curve is a way of expressing interest rates; it is a picture in time of the interest rate for a specific duration into the future. Because the World Bank was going to reset the interest rate it paid on the notes by relationship of the peseta to the D-mark, a person analyzing the notes would need to know their yield curves. Bowman obtained a yield curve for both currencies as of August 7, 1992, from Bloomberg, an electronic information source. Based upon the Bloomberg information, Bowman testified that Spain's interest rates were considerably higher than Germany's rates. He said that gaps in the interest rates relating to currencies are very instrumental in determining the future value of the exchange rate. Bowman's testimony, based on his calculations, showed that in

three years the interest rate on the notes would go to zero. He explained this would occur "[b]ecause interest rates are so much higher in Spain that in order to come back to an exchange rate to adjust for those interest rates, the peseta will decline in value roughly 3% a year." Bowman stated, "the yield curve tells me that the value of the peseta will drop and drop pretty dramatically over a period of time."

We hold this evidence is legally sufficient to support the jury's verdict that Duperier and Howard Weil omitted to inform the Bank of material facts that would have made statements made, under the circumstances of this case, not misleading. The jury could have believed this evidence and the exhibits admitted into evidence would have been viewed by a reasonable investor as significantly altering the total mix of information made available.

Duperier testified that he gave the Bank all the information he knew. He said he did not tell Garza about the Danish rejection of the Treaty because he believed the information was common knowledge. Appellants presented as evidence, articles from the McAllen *Monitor* newspaper discussing the Danish rejection. John Wesley Peavy, III, appellants' expert witness, testified that information about the Danish rejection was all over the newspapers during the summer of 1992 and opined that Duperier should not have to disclose common knowledge information.

Garza testified, however, that he would not have keyed into this information at the time because he believed the information was not relevant to any of his investments. In addition, the articles do not describe the effect the rejection had on the Spanish government and the peseta. Peavy testified that someone doing due diligence should have been familiar with the effect of the rejection and that if they were not, then the due diligence performed was improper.

Duperier admitted that he did not go outside the information he learned from First Boston for facts about the notes, but he did not testify that outside information was not reasonably available to him, nor could he. One of appellants' defensive strategies was to argue the sources for the omitted facts were available to the Bank. While this might be true, the Bank's due diligence, or lack thereof, is not a defense available to appellants under the Act. Appellants had to prove by a preponderance of the evidence that the Bank actually knew the omitted facts at the time they purchased the notes.

At trial, when he was shown a copy of the yield curve Bowman relied on, Garza testified that he did not understand it. However, he explained that if a yield curve had been provided, an explanation for its use and interpretation would likely have been included. Peavy disagreed that Bowman's yield curve calculations were legitimate methods for calculating the peseta's future interest rate. He said studies showed that when predictions are based on the yield curve analysis, the opposite of the predictions actually happens. Peavy also testified that his research did not find anyone who, during the summer of 1992, was predicting a realignment of the ERM.

The jury also saw the prospectus and other documents through which First Boston provided information to investors. The prospectus and documents informed the Bank that various factors, such as inflation rates, interest rate levels, commodity prices, balance of payments, and governmental surpluses or deficits, could cause changes in the rate of exchange between the peseta and the D-mark. Such changes could be significant, and the interest rate on the notes could, therefore, range from 0% to 24%. The prospectus also reflected that had the notes been in existence in March 1987, the interest rate would have been 0% for the first two years. It warned that past fluctuations were not necessarily indicative of future changes which could be greater or lesser than historical trends.

One document reflected, however, that the peseta had been "remarkably well-behaved" since joining the EMS, was the second strongest currency in the EMS, and had shown continuous growth. This information was identified by a handwritten note as key. An arrow directed the reader to another paragraph which stated that the peseta's performance was "stellar" and that Spain had made substantial progress toward convergence with other EMS members. A handwritten note at the bottom of this document told the reader "[t]he peseta has appreciated 2.13% vs the Dm since it became a member of the EMS in June 1989."

The jury heard the evidence regarding the omissions, and saw and heard the evidence concerning information contained in the prospectus as well as other documents. Appellants tried to convince the jury that the prospectus and documents should have been read to raise red flags with an investor. The jury was free to weigh this evidence, and any conflicts in the evidence was for the jury to resolve.

As to Howard Weil's commission, the evidence shows Duperier believed the commission offered by First Boston was acceptable because the notes were hard to sell. First Boston was offering to pay Howard Weil one-half of a percent to sell the bonds. The normal broker's commission was three-eighths of a percent. The prospectus states that First Boston would get a commission of three-tenths of a percent. First Boston gave Howard Weil all that and two-tenths more. Although the Bank was not charged the commission, the jury could have believed the omission to notify the Bank of the actual commission was material. When considered with the information provided and with that omitted, the jury could have found by a preponderance of the evidence that a reasonable investor would have questioned whether the large commission was an indication of undisclosed problems with the notes.

We hold the evidence is factually sufficient to support the jury's verdict. We overrule appellants' second and third issues.

## E. DEFENSES

### 1. "Bespeaks Caution" Doctrine

■ In their first issue, appellants contend the "bespeaks caution" doctrine applies to the materiality element of the Act and bars claims where the written disclosure documents clearly and adequately caution a sophisticated investor of the risk at issue.

Appellants ask this Court to adopt the bespeaks caution doctrine from federal law and apply it to the facts of this case. In the alternative, they argue that the trial court erred by failing to instruct the jury on the bespeaks caution doctrine.

Under the bespeaks caution doctrine, when "forecasts, opinions, or projections are accompanied by meaningful cautionary statements, the forward looking statements will not form the basis for a securities fraud claim if those statements did not affect the total mix of information" provided investors. *In re Donald Trump Casino Sec. Litig.—Taj Mahal Litig.*, 7 F.3d 357, 371 (3rd Cir.1993), *cert. denied*, 510 U.S. 1178, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994). The doctrine addresses "situations in which optimistic projections are coupled with cautionary language—in particular, relevant specific facts or assumptions—affecting the reasonableness of the reliance on and the materiality of those projections." *Rubinstein, et al. v. Collins, et al.*, 20 F.3d 160, 167 (5th Cir.1994). Materiality is judged in light of the surrounding context. *Id.* at 168.

Given the facts of this case and the prospectus at issue, we decline to adopt the bespeaks caution doctrine. We further hold that the trial court did not err by refusing to give the jury an instruction on a doctrine not recognized by the statutory or case law of this state. We overrule appellants' first issue.

### 2. *Ratification*

■ In their fourth issue, appellants question whether the Bank's ratifying the purchase of the notes bars claims under the Act. Appellants' contention is without merit.

The common law defense of ratification will not save a transaction which violates a statute. *Insurance Co. of N.A. v. Morris,* 928 S.W.2d 133, 154 (Tex.App.—Houston [14th Dist.] 1996), *aff'd in part and rev'd in part on other grounds,* 981 S.W.2d 667 (Tex.1998); *Mayfield v. Troutman,* 613 S.W.2d 339, 344 (Tex.Civ.App.—Tyler 1981, writ ref'd n.r.e.); *see Peniche v. Aeromexico,* 580 S.W.2d 152, 157 (Tex.Civ. App.—Houston [1st Dist.] 1979, no writ) (contract violating statute is not subject to ratification); *Continental Fire & Cas. Ins. Corp. v. American Mfg. Co.,* 221 S.W.2d 1006, 1009 (Tex.Civ.App.—Fort Worth 1949, writ ref'd). In addition, ratification is not a defense available under the Act. *Mayfield,* 613 S.W.2d at 344; *see* TEX.REV. CIV. STAT. ANN. art. 581–33(A)(2) ("However, a person is not liable if he sustains the burden of proof that either (a) the buyer knew of the untruth or omission or (b) he (the offeror or seller) did not know, and in the exercise of reasonable care could not have known, of the untruth or omission."). Moreover, article 581–33 contains a provision voiding waivers which has been interpreted by the Fifth Circuit as barring the defense of ratification by subsequent conduct unless that conduct can be interpreted as a settlement. *See* art. 581–33(L); *see also Haralson v. E..F. Hutton Group, Inc.,* 919 F.2d 1014, 1034 (5th Cir.1990). We overrule the fourth issue.

### 3. *Comparative Fault*

■ In their fifth issue, appellants contend the trial court erred by not submit-

ting a jury question on comparative fault. Appellants argue that claims under article 581–33A(2) sound in negligence and that comparative fault is applicable to the Bank's claim.[3]

The Bank responds that applying a comparative fault standard to article 581–33A(2) would obviate the absolute defenses available to appellants under the article. We agree.

The statute excludes from liability any defendant who can prove the plaintiff knew the misrepresentations or the omissions or that the defendant did not and could not with reasonable care know the information. Once proven, the defendant is entitled to absolute relief from liability. Because the statute provides no other defenses, and a comparative fault defense would abrogate the effect of the statute, we hold the trial court did not err in refusing to submit a jury question on this issue. Appellants' fifth issue is overruled.

### 4. *Loss Causation*

■ In their sixth issue, appellants contend that, as a matter of law, the Bank's claims under the Act fail because the sole cause of damages was the Spanish government's two devaluations of the peseta. In the alternative, appellants claim the trial court erred in refusing to instruct the jury on its loss causation defense.

Article 581–33A(2) establishes the elements and defenses available under the Act. Loss causation is not an element of or a defense to a claim brought under this particular provision of the Act. Until it was amended in 1995, the federal version of article 581–33A(2), 15 U.S.C. § 77*l* (1) (commonly known as section 12(2) of the Securities Act), did not impose loss causation criteria and federal courts did not include loss causation as an element in a

---

**3.** In support of their contention, appellants cite two unpublished federal opinions and a case from Louisiana which is neither controlling nor persuasive. *See Landry v. Thibaut,* 523 So.2d 1370, 1380 (La.Ct.App.), *writ denied,* 526 So.2d 809 (La.1988); *Tranchina v.*

*Howard, `Weil, Labouisse, Friedrichs, Inc.,* 1996 U.S. Dist LEXIS 9705, 1996 WL 392172 (E.D.La. July 11, 1996); *Bulgo v. Munoz,* 1987 U.S. Dist. LEXIS 15835 (D.Haw. May 30, 1987).

cause of action brought under that section. *See Caviness v. Derand Resources Corp.*, 983 F.2d 1295, 1305 (4th Cir.1993) (rejecting argument that failure to plead loss causation justified dismissal); *Ackerman v. Schwartz*, 947 F.2d 841, 845 (7th Cir. 1991) (missing from section 12(2) is reference to causation); *see also* 15 USCS § 77*l* (b) (Lexis 2000) (adding loss causation). Article 581–33A(2) has never included loss causation.

We conclude that appellants were not entitled to rely on the loss causation defense. We hold the trial court did not err in refusing to instruct the jury on this issue. Appellants' sixth issue is overruled.

## F. DAMAGES AND INTEREST

### 1. *Mitigation*

 In their seventh issue, appellants question the trial court's decision to disregard the jury's mitigation finding or, in the alternative, whether the question on mitigation as submitted to the jury was overly confusing.

After reviewing state and federal case law, we have found no cases where mitigation was applied to article 581–33 claims, or to the similar federal provision, section 12(2). Article 581–33 sets out the specific methods for determining damages for a claim under the article. TEX.REV.CIV. STAT. ANN. art. 581–33(D) (Vernon Supp.2000). Mitigation of damages is not discussed within the article which is consistent with the anti-fraud intent of the statute. *See Meadolake Foods, Inc. v. Estes*, 218 S.W.2d 862, 868, 872 (Tex.Civ.App.—El Paso 1948) (injured party in fraud case has no duty to minimize damages resulting from fraud), *writ ref'd n.r.e.*, 219 S.W.2d 441 (Tex.1949). Mitigation may not be available relief for damages based on a violation of a statutory duty. *See Kendall v. Chicago, R.I. & G. Ry. Co.*, 95 S.W. 757,

759 (Tex.Civ.App.1906, no writ); 5 J. Edgar & J. Sales, TEXAS TORTS & REMEDIES § 88.20[1] (1977). We hold the trial court properly disregarded the jury finding on mitigation of damages and overrule appellants' seventh issue.

### 2. *Prejudgment Interest*

 In their eighth issue, appellants contend the trial court erred in assessing prejudgment interest at ten percent, compounded daily. We agree.

Article 581–33D allows prejudgment interest at the legal rate from the date the securities were purchased. At the time of the judgment, the legal interest rate applicable was that set by the supreme court in *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549, 552 (Tex.1985). *Anheuser–Busch*, 858 S.W.2d at 944 (assessing interest in an article 581–33 case at 10% compounded daily). However, Cavnar was modified by the supreme court in *Johnson & Higgins of Tex. v. Kenneco Energy, Inc.*, to allow prejudgment interest at 10% simple interest.[4] *Johnson & Higgins of Tex. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 532 (Tex.1998). *Kenneco* also provided that the modification was applicable "to all cases in which judgment is rendered on or after December 11, 1997, and to all other cases currently in the judicial process in which the issue has been preserved." *Id.* at 533. Although the judgment in the case before us was rendered on July 25, 1997, we conclude *Kenneco* applies because the case is in the judicial system, and the issue of prejudgment interest was preserved.

The trial court rendered judgment that the Bank recover $1,198,341.75 in damages for notes sold prior to trial. The prejudgment interest on this amount under *Kenneco* should be $594,377.48 (damages × 10% × 4.96 years[5]). The judgment also

---

**4.** The difference between "simple interest" and "compound interest" is that "simple interest" does not merge with principal and thus does not become part of the base on which future interest is calculated. BLACK'S LAW DICTIONARY 813 (6th ed.1990).

**5.** August 7, 1992 to July 25, 1997 = 4 years and 352 days. $352/365 = .96$.

awarded the Bank $3,356,825.00 for recission of notes held by the Bank at the time of the judgment or at maturity of the notes. Prejudgment interest on this amount should be $1,664,985.20 (damages × 10% × 4.96 years). We sustain appellants' eighth issue.

### G. CUMULATIVE ERRORS

In their tenth issue, appellants' contend multiple errors committed by the trial court caused the rendition of an improper verdict based on prejudice and bias.

#### 1. *Grantor Agreement*

Appellants complain the trial court erred by permitting some evidence of the Bank's relationship with its trust customers, but excluding other evidence. In particular, appellants complain of a "Grantor Agreement" that was not admitted into evidence before the jury.

Appellants seem to argue that the Grantor Agreement would have shown the Bank was telling its regulators one thing while telling its customers another. No further explanation is offered for this argument, and we are unable to glean any from the appellants' references to the record.

After reviewing the record, we conclude the Grantor Agreement is cumulative of other admitted evidence and is not relevant to the issues presented in this case, *i.e.,* misrepresentations, omissions, the Bank's knowledge, and appellants' reasonable care in searching out material information.

#### 2. *List of Trust Customers*

Appellants complain that the Bank's introduction of a list of trust customers was prejudicial, but no objection was raised to this evidence. Thus, this complaint was not preserved for our review. TEX.R.APP. P. 33.1. Also, the Bank sued appellants on its own behalf and on behalf of certain trust customers.

#### 3. *Testimony of Glen Roney*

Appellants next complain that Roney testified about his personal achievements, hobbies, military service, friends, and acquaintances. They cite us to thirty pages of testimony they claim was prejudicial. Appellants assert they raised repeated objections to the testimony.

Appellants have failed to adequately preserve error for our review, because a party should object every time inadmissible evidence is offered. *See* TEX. R.APP. P. 33.1. If a party objects to certain evidence, but later does not object when the same evidence is introduced, the party waives its objection. *Richardson v. Green,* 677 S.W.2d 497, 501 (Tex.1984). A party can preserve error to repeated offers of the same evidence by asking the court for a running objection. *State v. Baker,* 574 S.W.2d 63, 65 (Tex.1978).

We find three objections in the thirty pages of testimony. An objection to plaintiffs' counsel testifying through his questioning was sustained. Objections to detailed testimony about Roney's military background and to the relevance of his community involvement were overruled. Appellants did not ask the trial court for a running objection.

We note appellants' counsel stated at one point that he had no objection to Roney's background information. Appellants' objection to plaintiffs' counsel testifying through his questioning was not preserved because they did not obtain an adverse ruling. TEX.R.APP. P. 33.1; *see Ortiz v. Ford Motor Credit Co.,* 859 S.W.2d 73, 77–78 (Tex.App.—Corpus Christi 1993, writ denied). Before and after appellants objected to the irrelevance of Roney's military background, Roney testified about his military experience. The same occurred after appellants' objection to Roney's community involvement. Roney was able to testify about the organizations he is involved in, honors he has received, and his views regarding the bank's involvement in "the bloodstream of the community." Ap-

pellants did not object each time or obtain a running objection concerning Roney's testimony about his military background or community involvement. We conclude the trial court did not abuse its discretion in permitting Roney's testimony because appellants failed to preserve the error for our review.

### 4. *Testimony of George Carruthers*

■ Appellants also complain of prejudicial hearsay evidence admitted over their numerous objections and through Carruthers's testimony. Specifically, appellants complain that Carruthers was allowed to testify regarding statements made by Duperier to Garza as repeated by Garza. Assuming this evidence was hearsay, we conclude that any error in admitting it was harmless. Carruthers testified several times that he had not personally talked to Duperier before the notes were purchased and that he was relying on Garza's interpretation of Duperier's statements. In addition, Garza and Duperier both testified extensively concerning their conversation regarding the notes. We conclude that any prejudicial effect of Carruthers's testimony was minimized by the vast amount of other evidence reflecting the true nature of Duperier's statements.

### 5. *Local Bias and Prejudice*

■ Finally, appellants contend the trial court allowed the Bank to appeal to local bias and prejudice by referring, in its closing argument, to the fact that appellants' counsel was not from Texas. Because appellants did not object to the closing argument, they have not preserved this complaint for appeal. TEX.R.APP. P. 33.1.

■ Having concluded that although the trial court may have erred only in the admission of hearsay evidence and that such error was harmless, we find no cumulative error. Appellants' tenth issue is overruled.[6]

### H. CONCLUSION

We modify the judgment of the trial court to reflect that prejudgment interest for the notes which the Bank sold prior to trial is $594,377.48, and that prejudgment interest for the notes held by the Bank on July 25, 1997,[7] or maturity of the notes, is $1,664,985.20.

We affirm the trial court's judgment, as modified.

Dissenting Opinion by Justice J. BONNER DORSEY.

J. BONNER DORSEY, Justice, dissenting.

I respectfully dissent. To recover under the anti-fraud provision of the Texas Securities Act (TSA) Texas State Bank (the Bank) had to prove by a preponderance of the evidence that the offer or sale of the World Bank bonds was "by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, . . . ." TEX. REV.CIV. STAT. ANN. art. 581–33A(2) (Vernon Supp.2000). The majority holds that the "evidence is legally sufficient to support the jury's verdict that Duperier and Howard Weil omitted to inform the Bank of material facts that would have made statements made, under the circumstances

---

6. Appellants list as their ninth issue, the trial court's error in assessing attorney's fees. However, appellants do not address this complaint in their main brief. We do find some argument in appellants' reply to the Bank's brief. Appellants state that the argument and citation to authorities was omitted from their original brief because of the fifty page limit for briefs. *See* TEX.R.APP. P. 38.4. We conclude the issue is waived. TEX.R.APP. P.

38.1(h). In addition, their argument that the trial court should have assessed only at the standard hourly rate lacks merit. *See Arthur Andersen v. Perry Equip. Co.*, 945 S.W.2d 812, 818 (Tex.1997) (listing eight factors that may be considered).

7. The trial court signed the final judgment on July 25, 1997.

of this case, not misleading." I do not find any evidence that the defendants knew any material facts that they failed to reveal to the bank. I would hold that Frank Duperier and Howard Weil did not violate the TSA as a matter of law.

The majority correctly concluded that there is no evidence to prove that Duperier made a misrepresentation when he said that Howard Weil had performed more due diligence on these bonds than on any other. The majority also correctly concluded that Duperier's statements that the bonds were a safe and suitable investment and that there was no realistic chance that the interest rate on the bonds would fall to zero were opinions and not in and of themselves misrepresentations of fact actionable under the TSA.

The Bank alleges that Duperier and Howard Weil violated the TSA because they omitted four items of information pertaining to the sale of the bonds: (1) instability in Europe; (2) the yield curves and calculations of future currency values; (3) the overvaluation of the Spanish peseta; and (4) the commission paid to Howard Weil. The majority concluded that when these omissions are considered in light of Duperier's opinions about the bonds—that the bonds were a safe and suitable investment and that there was no realistic chance that the yield would go to zero— there is sufficient evidence to support the jury's verdict. I disagree with this conclusion.

The general rule is that pure expressions of opinion cannot be fraudulent misrepresentations. *See Trenholm v. Ratcliff,* 646 S.W.2d 927, 930 (Tex.1983). An exception to this rule exists when the person giving the opinion has knowledge superior to that of the person relying upon the opinion, as, for example, when the facts underlying the opinion are not equally available to both parties. *McCollum v. P/S Investments, Ltd.,* 764 S.W.2d 252, 254 (Tex.App.—Dallas 1988, writ denied). *See Wright v. Carpenter,* 579 S.W.2d 575, 580 (Tex.Civ.App.—Corpus Christi 1979, writ

ref'd n.r.e.). This concept was first discussed in *Huffmaster v. Toland,* 250 S.W. 468 (Tex.Civ.App.—Texarkana 1923, writ dim'd). In that case the court stated:

> If the representation is as to a matter not equally open to both parties it may be said to be a statement of fact as such; but if it is as to a matter that rests merely in the judgment of the person making it, and the means of deriving information upon which a fair judgment can be predicated *are equally open to both parties, and there is no artifice or fraud used to prevent the person to be affected thereby from making an examination and forming a judgment in reference to the matter for himself, the representation is a mere expression of opinion.*

*Id.* at 470 (emphasis added).

The crux of this lawsuit is that the interest rate on the bonds fell to zero. The evidence is undisputed that Duperier told Carlos Garza, the Bank's trust officer, that there was almost no chance that the interest rate would fall to zero. However it is also undisputed that Garza did not accept this statement as a performance guarantee. Duperier never told Garza that the interest rate would not go to zero. Prior to making the decision to buy the bonds Garza knew, based upon information contained in the prospectus, that the interest rate could fall to zero. Duperier gave Garza all the information that he had on the bonds, including the prospectus. What information did Duperier not disclose to Garza? In order for Duperier to wrongfully withhold knowledge from Garza about the proposed investment, he must first have it. There is no evidence that Duperier had any information other than that he told and gave the bank that tended to show an increased risk that the interest rate could fall to zero.

The bank relies on two types of information that should have been revealed by Duperier. The first kind is reflected by the testimony of its expert, Lee Bowman,

about the uncertainty of monetary stability in Europe following Denmark's rejection of the Maastricht Treaty, and the volatility of the peseta in that atmosphere.

Lee Bowman testified that his research showed that there was pressure in the exchange rate between the peseta and the Deutsche mark and that there would be a possible re-alignment of the ERM, which could cause the interest rate on the bonds to fall to zero. All of Bowman's research came from sources available to the public. The evidence does not show that Duperier or Howard Weil had exclusive control of any information showing that the interest rate on the bonds could fall to zero. Nor is it evidence that Duperier had the information and failed to give it to Garza. That the knowledge was widely available is not evidence that Duperier had it and failed to communicate it to his customer.

The evidence was that Garza had investment experience. He had worked as a certified public accountant and started his career as a trust officer at McAllen State Bank in 1985. At McAllen State Bank he was involved with the purchase of investments for trusts and served as a member of that bank's investment committee. When he left McAllen State Bank to join Texas State Bank he was the number two man in its trust department and ran its day-to-day operations. He left McAllen State Bank in November 1987 and helped create the trust department at Texas State Bank. While working in the Bank's trust department he had the job of analyzing investment options. Garza considered himself an experienced investment counselor, and had purchased sophisticated securities based on international or multi-country financial dealings, the Libor bonds. His testimony showed that Glen Roney, the Bank's president, had vast experience in investments.

Garza read the information which Duperier gave him concerning the bonds. Based upon Garza's credentials as an experienced investment counselor, he was capable of understanding the materials and performing his own research on the bonds. Garza knew that downside risk is a feature inherent in the concept of the securities market, yet he chose to buy bonds which paid an interest rate tied to fluctuations in the value of European currencies. The bonds he purchased originally had an initial interest rate of 9%—substantially higher than U.S. Government or other traditionally conservative securities—and could float between zero and 24%. As an investment counselor he was aware of the rule that risk and reward are generally directly related; that a higher risk generally commands a higher return than a more conservative investment.

The Bank also argues, and the majority agrees, that Duperier's failure to disclose his commission on the bonds was "an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading." The claim is that the sellers knew the bonds were hard to sell, probably because the future interest rate was uncertain and risky, and that Duperier did not disclose that the commission he and Howard Weil received for selling them was higher than they usually received for the sale of other securities. I do not believe that the rate of commission the salesman is to receive is material to the sale, so as to constitute information the purchaser should have before making the decision to buy. The omission of such a disclosure does not tend to make other statements not misleading.

I find no evidence to support the verdict. Accordingly, I would reverse the judgment and render that the plaintiff take nothing.