**Reverse and Remand in part; and Affirmed in part; and Opinion Filed August 16, 2016**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-15-00413-CV

### JOHN C. GANTER, Appellant
### V.
### INDEPENDENT BANK, F/K/A UNITED COMMUNITY BANK, N.A., Appellee

**On Appeal from the 298th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. 12-13675**

## MEMORANDUM OPINION

Before Justices Lang, Brown, and Whitehill
Opinion by Justice Whitehill

This suit arises from Appellant John C. Ganter's various contract, tort, and declaratory judgment claims all alleging generally that appellee Independent Bank (i) improperly applied funds from a joint account that should have been used to retire his limited guaranty liability and (ii) tortiously induced him to sign loan modification agreements and to obtain a loan to retire his thusly overstated guaranty liability. The bank counterclaimed for breach of contract based on his loan. The bank won summary judgment on the whole case. Appellant appeals that ruling with four issues.

This appeal also requires us to address the effect of appellant's untimely filed pleadings and the potential application of the *Malooly*[1] doctrine whereby a party may waive challenges to a summary judgment if that party does not challenge on appeal every ground on which that judgment could have been granted.

As discussed below, we reverse the trial court's judgment dismissing appellant's contract breach, negligent misrepresentation, quantum meruit, money had and received, and all but one of his declaratory judgment claims. We also reverse the summary judgment in the bank's favor on its counterclaim. We otherwise affirm and remand the case for further proceedings.

## I. BACKGROUND

### A. Facts

The following facts are alleged in appellant's third amended petition, supplemented with additional facts drawn from the summary judgment evidence as noted:

John Ganter is Chris Ganter's father.

According to Chris's affidavit, he started a real estate business called CDG. CDG bought several unfinished townhome lots from a builder that had stopped construction on them before finishing the townhomes.

CDG found several investors to buy some of the unfinished lots, and eventually eight buyers each obtained a construction loan with the bank under one-year promissory notes (the "Townhome Loans"). Chris and John signed limited guaranties for those loans. John guaranteed a total of $352,000 of debt, while Chris guaranteed a total of $95,000.

The real estate market crashed, and the borrowers defaulted on their loans. The Ganters thereafter established a joint bank account from which payments were made on various debts

---

[1] *Malooly Bros., Inc. v. Napier*, 461 S.W.2d 119 (Tex. 1970).

related to the townhomes, including principal, interest, homeowners association dues, and property taxes. The Ganters paid over $1.1 million on these debts.

The bank required the borrowers to execute loan modification agreements extending the terms of the original notes. These agreements bore effective dates in May 2011. The Ganters also signed these agreements.

In late 2011, the bank told John that he was in default on his guaranties and demanded that he open a separate $450,000 line of credit to pay down his and Chris's guaranties. Based on the bank's representations, which he alleges were false, John signed a commercial loan agreement for a one-year $450,000 revolving draw loan. He also signed a promissory note, and assignments of 7,143 shares of UPS stock and a certificate of deposit to secure that loan. When the loan matured, the bank demanded payment and threatened to foreclose on the collateral.

### B.    Procedural History

In November 2012, John sued the bank. His second amended petition asserted (i) fraud, (ii) fraud by nondisclosure, (iii) negligent misrepresentation, (iv) quantum meruit, (v) money had and received, and (vi) declaratory judgment claims.[2]

The bank answered and counterclaimed, alleging that John breached the revolving note.

The bank also moved for summary judgment on the entire case on traditional and no evidence grounds. The bank sought to recover its attorneys' fees but no damages on its counterclaim. The motion was set for hearing on 14 August 2013.

Five days before the hearing, John filed a third amended petition, adding defamation and contract breach claims against the bank, and objected to the bank's summary judgment evidence. Three days later, he filed a summary judgment response.

---

[2] The petition asserted other claims and named two other defendants, but those claims and defendants are not at issue in this appeal.

–3–

The day before the hearing, the bank objected to John's summary judgment evidence and third amended petition.

The trial court heard the bank's summary judgment motion and took it under advisement without ruling on the banks' motion or any objections.

The next day, John moved in writing for leave to file his third amended petition, which the bank opposed. The trial court never ruled on that motion.

About seventeen months later, the bank filed a supplemental summary judgment motion seeking, among other things, to prove the bank's additional attorneys' fees incurred after the summary judgment hearing. That supplemental motion also attacked John's breach of contract claim, which he added in his third amended petition.

John responded to the supplemental summary judgment motion, objected to the bank's supplemental summary judgment evidence, and nonsuited his defamation claims.

After this summary judgment hearing, the trial court granted the bank's original and the supplemental summary judgment motions without specifying its grounds, dismissed John's claims with prejudice, and awarded the bank attorneys' fees of almost $154,000, plus additional appellate attorneys' fees.

John appealed.

## II. ISSUES

John asserts four issues, summarized as follows:

1.      The trial court erroneously dismissed his claims because the bank did not show that no genuine issues of material fact exist on John's claims.

2.      The trial court erroneously dismissed John's claims because the bank did not show that no genuine issues of material fact exist on the bank's affirmative defenses.

–4–

3. The trial court erroneously granted summary judgment on the bank's counterclaim because the bank did not show that no fact issues existed on the counterclaim.

4. The trial court erroneously granted summary judgment on the bank's counterclaim because John raised fact issues on his affirmative defenses.

### III. STANDARD OF REVIEW

We review a summary judgment de novo, *Smith v. Deneve*, 285 S.W.3d 904, 909 (Tex. App.—Dallas 2009, no pet.), applying these principles:

When we review the granting of a defendant's traditional summary judgment motion, we determine whether the defendant conclusively disproved an element of the plaintiff's claim or conclusively proved every element of an affirmative defense. *Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 425 (Tex. 1997); *Smith*, 285 S.W.3d at 909.

When we review the granting of a plaintiff's traditional summary judgment motion, we determine whether the plaintiff conclusively established every element of its claim. *Anderton v. Cawley*, 378 S.W.3d 38, 46 (Tex. App.—Dallas 2012, no pet.).

When we review the granting of a no-evidence summary judgment, we determine whether the nonmovant adduced sufficient evidence to raise a genuine fact issue on the challenged elements. *Smith*, 285 S.W.3d at 909.

In each instance, we take evidence favorable to the nonmovant as true, and we indulge every reasonable inference and resolve every doubt in the nonmovant's favor. *Williams v. Bell*, 402 S.W.3d 28, 34 (Tex. App.—Houston [14th Dist.] 2013, pet. denied). Likewise, we credit evidence favorable to the nonmovant if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not. *See Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006). However, "[a] matter is conclusively established if ordinary minds could not differ as to

the conclusion to be drawn from the evidence." *In re Estate of Hendler*, 316 S.W.3d 703, 707 (Tex. App.—Dallas 2010, no pet.).

We usually review no-evidence summary judgment grounds before we review traditional grounds. *Warren v. Carlson Rests., Inc.*, No. 05-14-01232-CV, 2015 WL 9590579, at *1 (Tex. App.—Dallas Dec. 30, 2015, no pet.) (mem. op.).

## IV. ANALYSIS

**A.** **Issues One and Two: Did the trial court err by granting summary judgment for the bank on John's claims?**

John raises several arguments under his first two issues. We address each in turn.

**1.** **Did the trial court err by granting summary judgment on John's breach of contract claim?**

John based his contract breach claim on the limited guaranties, claiming that the bank breached the guaranties by applying John's "personal funds" to the Townhome Loans in excess of his obligations. The bank's supplemental summary judgment motion raised no-evidence challenges to every element of John's breach of contract claim. John argues that he raised a genuine fact issue as to each element. We agree with John.

### a. Timeliness of John's Pleading

The bank argues that John's contract breach claim was not before the trial court because (i) John did not timely plead it and (ii) the trial court did not grant leave for the late filing. We disagree with the bank because there were multiple summary judgment hearings and John's filing was timely as to the final one.

John first pled his breach of contract claim in his third amended pleading, filed five days before the first summary judgment hearing. This filing was untimely for that hearing. *See Goswami v. Metro. Sav. & Loan Ass'n*, 751 S.W.2d 487, 490 (Tex. 1988) (leave required to amend pleadings less than seven days before summary judgment hearing). And the final judgment recites that the trial court considered "the pleadings timely filed." Had there been no

other summary judgment hearing, this language would indicate that the trial court did not consider John's third amended petition. *See John C. Flood of DC, Inc. v. SuperMedia, L.L.C.*, 408 S.W.3d 645, 654 (Tex. App.—Dallas 2013, pet. denied).

But here there was a second summary judgment hearing after the bank filed its supplemental summary judgment motion. The supplemental motion not only addressed John's newly pled claims but also supplemented the bank's attorneys' fees evidence regarding its counterclaim. And John's third amended petition was filed more than seven days before the second hearing.

The key date concerning the timeliness of John's amended pleading "is the date of the final hearing from which the summary judgment sprang." *Segal v. Bock*, No. 01-10-00445-CV, 2011 WL 6306623, at *4 (Tex. App.—Houston [1st Dist.] Dec. 15, 2011, no pet.) (mem. op.); *accord Selz v. Friendly Chevrolet, Ltd.*, 152 S.W.3d 833, 834–35 (Tex. App.—Dallas 2005, no pet.); *Cantu v. Holiday Inns, Inc.*, 910 S.W.2d 113, 115 (Tex. App.—Corpus Christi 1995, writ denied). So the third amended petition became timely filed and was properly before the trial court.

### b. Analysis of the No-Evidence Summary Judgment

The breach of contract claim elements are "(1) a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of that breach." *Petras v. Criswell*, 248 S.W.3d 471, 477 (Tex. App.—Dallas 2008, no pet.). A contract breach occurs when a party fails to perform an act it has expressly or impliedly promised to perform. *Esty v. Beal Bank S.S.B.*, 298 S.W.3d 280, 299 (Tex. App.—Dallas 2009, no pet.). Here, the bank challenged every element of John's contract breach claim.

### (1) Existence

John relies on the limited guaranties to support his contract breach claim. Both parties filed copies of the various limited guaranties John signed. This is some evidence that valid contracts existed.

### (2) Performance

Next, John asserts that there is some evidence that he performed his obligations under the guaranties. The bank, however, argues that the trial court struck all the evidence John relies on. And John did not appeal the trial court's rulings. Nonetheless, we agree with John that the remaining evidence raised a genuine fact issue regarding his performance.

Chris's affidavit is key evidence on that element, and we disregard its stricken parts. Chris first generally described the business plan regarding the Townhome Loans. The investor-borrowers were to use the borrowed funds to buy the properties, complete construction of the townhomes, refinance their loans at a lower rate, and rent the townhomes out for profit. The bank, however, required Chris and John to sign limited guaranties for each such loan. John's guaranties totaled $352,000, while Chris's totaled $95,000.

The real estate market later crashed, and refinancing became impossible. Consequently, the loans became delinquent and went into default.

The bank demanded that John and Chris pay on the Townhome Loans as guarantors, which they did. Ganter Development, LLC, which John and Chris co-owned, also undertook to rent out the townhomes in hopes of covering the monthly payments.

In October 2008 Chris, John, and John's wife opened an account with the bank (the DDA).[3] Ganter Development also deposited money into the DDA, and Chris agreed that the

---

[3] The bank's summary judgment motion uses "DDA" as an acronym for "demand deposit account."

bank could withdraw money from that account. But Chris never authorized the bank "to pay down any amount in excess of our guarantees."

Key testimony comes from paragraph 24 of Chris's affidavit as follows:

> 24. Based upon these calculations, my Dad and I had paid UCB $453,260.87 (not including rent) by July 2010. This date presumes that UCB exhausted my $95,000 in guarantees first. If the bank applied all the funds to my Dad's guarantees first then he would have met his obligations by December 2009. I had assumed the bank was keeping track of all payments less the rent since Jerrel Jenkins was asking me for the rent rolls for auditors. As of March 2012, the Bank collected at least over $1 million from us, which amounted to roughly $ $628,166.45 after rent was excluded. Again, the amount collected is actually higher because I have not accounted for all expenses we incurred.

The referred to "calculations" are found in paragraph 23, which the trial court struck. The bank contends the rest of paragraph 24, which was not objected to, is conclusory and therefore no evidence. *See Riner v. Neumann*, 353 S.W.3d 312, 321 (Tex. App.—Dallas 2011, no pet.) ("A conclusory statement is one that does not provide the underlying facts in support of the conclusion."). We disagree, however, because the statement that John and Chris had paid the bank $453,260.87, not counting rent receipts being applied to the loans, by July 2010 is a statement of fact, not a conclusion. *See Wolfe v. Devon Energy Prod. Co., LP*, 382 S.W.3d 434, 452 (Tex. App.—Waco 2012, pet. denied) (statement "Mr. Wolfe paid for the property" was not conclusory).

Read as a whole, the non-stricken parts of Chris's affidavit create a reasonable inference that he caused or allowed over $453,000—not including rent—to be paid to the bank toward his and John's guaranties, which totaled only $447,000. His affidavit is thus some evidence that John's full limited guaranty obligation was met with funds from this DDA account.

Moreover, there is some evidence that the bank acknowledged that the payments were intended to satisfy the Ganters' guaranties. Attached to Chris's affidavit is a February 2009 email from the bank containing the following information:

**Chris Ganter**

From: Ryan Schroer <rschroer@unitedcommunity.com>
Sent: Tuesday, February 24, 2009 12:39 PM
To: Christopher David Ganter
Subject: RE: Updated invoice

Interest paid as guarantor for various borrowers:

| | $ | |
|---|---|---|
| Personal | 39,314.22 | 3541 |
| Personal | 17,493.42 | 3398 |
| Personal | 17,234.04 | 3399 |
| Personal | 34,219.50 | 3400 |
| Personal (Harris) | 5,550.60 | 32461 |
| Personal (Vehicle) | 3,538.24 | 3774 |
| Reyes Rodriguez | 9,260.00 | 3297 |
| Jonne Groomer | 13,779.39 | 3447 |
| Kara, Julho | 39,121.49 | 3563 |
| Hill, Brandon | 19,569.72 | 35651 |
| Yarbrough, Russell | 19,513.22 | 35661 |
| Donnelly, Craig | 22,335.67 | 35671 |
| Snelson, David | 20,227.35 | 35691 |
| Ward, Roy | 21,929.01 | 3584 |
| Mickens, Chauncey | 21,078.63 | 35851 |

163,773.09

This email is some evidence that the bank received sums as payments toward the Ganters' guaranties. Although the email uses the singular word "guarantor," suggesting that it refers only to Chris, it is undisputed that Chris's guaranties totaled only $95,000, while the listed payments exceed that amount. So the email supports a reasonable inference that the bank received the listed payments in satisfaction of both Chris's and John's guaranties.[4]

But the bank argues that the evidence shows that the money in the DDA did not belong to John. This is a hollow argument because nothing in the record shows that the source of the money that was applied to reduce John's debt mattered to the bank. The bank's counsel conceded as much during oral argument to this court.

### (3) Breach and Damages

John argues that the evidence also supports the breach element because it shows that the bank took more money from him than he owed on his limited guaranties. Specifically, he relies

---

[4] The bank argues that the trial court struck a copy of this same email as an attachment to John's affidavit and that we should therefore consider the copy attached to Chris's affidavit to have been struck as well. We disagree. Absent a running objection, party must object to objectionable evidence every time it is offered or the objection is waived. *Duperier v. Tex. State Bank*, 28 S.W.3d 740, 755 (Tex. App.—Corpus Christi 2000, pet. dism'd by agr.); *see also Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231, 235–36 (Tex. 2007) (per curiam).

–10–

on Chris's affidavit showing how much was paid towards their guaranties, as well as the evidence showing that the bank took still more money from him via the line of credit and liquidation of his collateral. We agree with John.

Each guaranty recites, "My liability will not exceed" a specific dollar amount regarding the underlying loan. We conclude that the bank impliedly promised not to take more money from John than he agreed to pay. *See Gaspar v. Lawnpro, Inc.*, 372 S.W.3d 754, 757 (Tex. App.—Dallas 2012, no pet.) ("Terms of a contract are implied when they are necessarily involved in the contractual relationship such that the parties must have intended to include them, but failed due to inadvertence *or because they were too obvious to need expression.*") (emphasis added).

As discussed above, there is more than a scintilla of evidence that John's limited guaranties were fully paid from the DDA by July 2010. And the bank presented evidence with its own summary judgment motion that over $302,000 was drawn on John's line of credit loan, and that John neither paid nor renewed the loan. Furthermore, the bank's own evidence shows that it sold the stock John pledged as collateral in the line of credit transaction and applied the proceeds to his alleged debt.

Based on the above, we conclude that there is more than a scintilla of evidence that (i) the bank breached its contractual agreements by exacting money from John in an amount more than the amount at which the bank agreed to limit his liability and (ii) John was thereby damaged by the resulting overpayment.

### (4) Conclusion

Based on the above, we conclude the trial court erred by granting a no-evidence summary judgment on John's breach of contract claim.

### c.    Can the summary judgment be sustained on traditional grounds?

The bank argues alternatively that it conclusively disproved essential elements of John's contract claim in its original summary judgment motion. Ordinarily, summary judgment cannot be granted on a later-added claim not addressed in the summary judgment motion, but there is an exception to this rule if the motion's grounds demonstrate the plaintiff's inability to recover on the later-added claim. *McIntyre v. Wilson*, 50 S.W.3d 674, 684–85 (Tex. App.—Dallas 2001, pet. denied) (defense of absolute privilege applied to later-added claims based on privileged conduct). However, those are not our facts. Here, the bank had ample opportunity to address John's breach of contract claim by a separate summary judgment filing and in fact did so seventeen months after he added his contract claim. Accordingly, we will consider only the summary judgment grounds the bank actually raised in its supplemental motion.

The bank's supplemental summary judgment motion directed toward John's contract breach claim argues that the bank conclusively proved that (i) the DDA funds were not John's money, (ii) Chris had the actual authority to deposit and withdraw the money, and (iii) Chris was authorized to apply the DDA funds to his benefit and not John's. But, as discussed above, there is some evidence that Chris, at the bank's request, allowed the DDA funds to be withdrawn to pay down his and John's limited guaranties and it is of no consequence whether it was actually John's money that was applied to pay his debt. Accordingly, the bank's arguments do not support summary judgment dismissing John's contract claim.

The bank next argues that John executed three additional guaranties in May 2010, so prior withdrawals from the DDA would not have affected John's liability on those guaranties. But the bank's supplemental summary judgment motion did not assert a ground based on this argument. Accordingly, this argument cannot support summary judgment on any claim, much less one that had not been pled yet. *See Tempay, Inc. v. Tanintco, Inc.*, No. 05-15-00130-CV,

2016 WL 192596, at *3 (Tex. App.—Dallas Jan. 15, 2016, no pet.) (mem. op.) ("[W]e may not affirm . . . a summary judgment on grounds that were not raised in the motion . . . .").

Likewise, the bank argues that the loan modification agreements defeat John's contract claim because those agreements (i) affirmed that John had no offsets or defenses to payment and (ii) contained releases of liability. But the bank did not assert a supplemental summary judgment ground on either basis. Accordingly, neither basis can support the summary judgment dismissing John's breach of contract claims. *See id.*

For these reasons, we conclude that the summary judgment on John's contract claim cannot be supported on traditional grounds. Accordingly, we reverse the summary judgment as to John's breach of contract claim.

### 2. Should we affirm the summary judgment on John's other claims under the *Malooly* doctrine?

Relying on *Malooly Bros., Inc. v. Napier*, 461 S.W.2d 119 (Tex. 1970), the bank argues that we should affirm the summary judgment on John's other claims because he did not challenge all possible grounds supporting that judgment. We disagree.

#### a. Applicable Law

If a summary judgment motion asserts multiple summary judgment grounds and the trial court grants the motion without specifying its reasons, the nonmovant must on appeal challenge every possible ground for the summary judgment. *See id.* at 121; *Worldwide Asset Purchasing, L.L.C. v. Rent-A-Center E., Inc.*, 290 S.W.3d 554, 569 (Tex. App.—Dallas 2009, no pet.). Otherwise, the appellate court may affirm the summary judgment based on the unchallenged grounds. *Worldwide Asset Purchasing*, 290 S.W.3d at 569.

Although the nonmovant may assert in a general appellate issue that the summary judgment was erroneous, it must also support that issue with argument challenging all possible grounds on which the summary judgment could have been granted or a reviewing court will

–13–

affirm the summary judgment. *See Jarvis v. Rocanville Corp.*, 298 S.W.3d 305, 313 (Tex. App.—Dallas 2009, pet. denied).

Here, it is difficult to identify the bank's specific summary judgment grounds. A "ground" is a reason entitling the movant to summary judgment. *Garza v. CTX Mortg. Co. LLC*, 285 S.W.3d 919, 923 (Tex. App.—Dallas 2009, no pet.). A summary judgment movant must state specific grounds for relief in the motion itself. *Bever Props., L.L.C. v. Jerry Huffman Custom Builder, L.L.C.*, 355 S.W.3d 878, 889 (Tex. App.—Dallas 2011, no pet.). If grounds are presented but are not clear, the nonmovant must specially except to preserve error. *Id.* But if a ground is not presented at all, the nonmovant need not have objected to contest that ground on appeal. *Id.*

To dispose of a plaintiff's entire case, a defendant's motion must identify each claim and address the essential elements of each claim on which the defendant contends there is no genuine issue of material fact. *Id.* Alternatively, the motion can assert and conclusively prove an affirmative defense to each claim. *See Am. Tobacco Co*, 951 S.W.2d at 425.

A ground is sufficiently specific if it gives fair notice to the nonmovant. *Bever Props., L.L.C.*, 355 S.W.3d at 889. But, even if the nonmovant does not specially except, an appellate court cannot read between the lines or infer from the pleadings any summary judgment grounds that are not expressly set forth in the motion itself. *Nall v. Plunkett*, 404 S.W.3d 552, 555 (Tex. 2013) (per curiam).

### b.  The Bank's Summary Judgment Motions

The bank's original summary judgment motion divides its attacks on John's claims into two parts:

First, it attacks John's fraud, fraudulent nondisclosure, negligent misrepresentation, quantum meruit, money had and received, and declaratory judgment claims to the extent they

–14–

allege that the payments from the joint account should have been allocated to pay John's guaranties. The bank's motion argues in two subsections that the evidence established that (i) Chris owned the money in the joint account and (ii) he had the authority to direct how payments from the account would be allocated. The motion also asserts res judicata, collateral estoppel, release (based on a litigation settlement agreement release Chris signed and loan modification agreement releases John signed), and statute of repose affirmative defenses.

Second, in a separate section, the motion lists four of John's claims—fraud, negligent misrepresentation, quantum meruit, and money had and received—and argues that (i) these claims are based on three alleged misrepresentations made before John signed the line of credit loan agreement and (ii) the misrepresentation theories have no merit. But this part of the motion does not identify or attack any specific elements of John's claims, nor does it assert any affirmative defenses.[5]

The bank's supplemental summary judgment motion, however, adds no-evidence attacks on every element of John's fraud and fraud by nondisclosure claims and his fraudulent inducement defense.

### c.    Application of the Law to the Facts

The bank argues that one of its summary judgment grounds was that Chris owned and had the right to direct payments from the joint account. It further argues that John's appellate brief does not challenge this ground, so we should affirm the judgment as to all claims.

We agree that the motion argued that Chris owned and had to right to direct payment of the joint account's funds. But, reading the motion as a whole, we conclude that it did not give fair notice that these premises were asserted as a summary judgment ground apart from the bank's affirmative defenses.

---

[5] The motion also includes no-evidence grounds attacking claims that are not part of this appeal.

First, the bank's motion contains the heading "GROUNDS FOR TRADITIONAL MOTION FOR SUMMARY JUDGMENT," followed by this paragraph:

14.    John asserts various causes of action (fraud, fraudulent nondisclosure, negligent misrepresentation, quantum meruit, money had and received, declaratory judgment, injunction) based on the theory that funds which his son Chris deposited into a joint account at [the bank], which were subsequently used to make payments on Investor Loans to [the bank], should be allocated instead to pay [John]'s limited guarantees on the Investor Loans. The claims suffer from several fundamental flaws.

Following that paragraph there is this subheading:

I.    John Cannot Complain That The Funds From The [Joint] Demand Deposit Account Were Not Paid To Reduce His Guarantees."

Following that subheading is an argument that the evidence and the law establish Chris's ownership of and authority to disburse the joint account funds. That argument contains two sub-subheadings:

A.    Chris Ganter was authorized by contract to direct payment of funds in the [joint account],

and

B.    Chris owned the funds in the [joint account].

The argument concludes:

Given that Chris contributed 100% of the deposits into the account, Chris, not John owned and could decide what to do with those funds. Thus only Chris has the right to direct the allocation of funds to pay a loan, or to pay only a guarantee and only Chris can complain if his instructions were not followed.

After that, the motion in four subsections argues that various affirmative defenses bar John's claims based on alleged misallocation of Chris's payments from the joint account. These subsections have the following headings:

C.    Claims based on incorrect allocation of payments from the [joint account] are barred by res judicata and collateral estoppel.

D.    Claims based on incorrect allocation of payments from the [joint account] are barred by Chris' release of Defendant.

–16–

E.      The Statute of Repose Bars John's Claims.

G.[6]    John's Releases Bar his Claims. Limitations [sic]

Subsections I(A) and I(B), however, do not identify or expressly attack any elements of John's claims, nor do they assert any affirmative defenses. They argue only that the evidence conclusively showed that Chris owned and had authority to disburse the funds in the joint account, without expressly asserting that those facts entitled the bank to summary judgment. That is, the bank did not connect those arguments to any specific element of John's claims that the bank's traditional motion was attacking. For example, although subsection I(B) concludes that "only Chris can complain if his instructions were not followed," the motion does not explain what element that premise negates or what defense it establishes.

By contrast, subsections I(C) through I(G) expressly argue that various affirmative defenses bar John's claims. But the bank did not connect subsections I(A) and I(B) to the specific elements of the affirmative defenses that it was attempting to establish as a matter of law. To treat subsections I(A) and I(B) as asserting a summary judgment ground, we would have to "read between the lines" or draw inferences, and that is not permitted. *See Nall*, 404 S.W.3d at 555.

Accordingly, we disagree with the bank's *Malooly* argument.

**3.      Was no-evidence summary judgment proper on John's fraud claims?**

The bank attacked John's fraud and fraud by nondisclosure claims[7] with no-evidence arguments. John argues that he produced enough evidence to raise genuine fact issues on every challenged element. We disagree.

---

[6] There is no subsection F.

[7] John's appellate brief asserts that he pled a claim for fraudulent inducement along with fraud and fraud by nondisclosure, but his third amended petition does not plead a separate fraudulent inducement claim.

### a. Applicable Law

"The elements of fraud are (1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, he knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the defendant made the representation with the intent that the plaintiff should act on it; (5) the plaintiff acted in reliance on the representation; and (6) the plaintiff thereby suffered injury." *Baleares Link Express, S.L. v. GE Engine Servs.–Dallas, LP*, 335 S.W.3d 833, 839 (Tex. App.— Dallas 2011, no pet.). To be actionable in fraud, a representation generally must be one of fact. *Trenholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex. 1983).

The nondisclosure of known facts may be fraudulent if there was a duty to disclose. *See Myre v. Meletio*, 307 S.W.3d 839, 843 (Tex. App.—Dallas 2010, pet. denied). A duty to disclose arises when (i) the parties have a confidential or fiduciary relationship, (ii) a party voluntarily discloses information, which gives rise to a duty to disclose the whole truth, (iii) a party, having made a representation, learns new information that makes the earlier misrepresentation misleading or untrue, or (iv) a party makes a partial disclosure and conveys a false impression. *Solutioneers Consulting, Ltd. v. Gulf Greyhound Partners, Ltd.*, 237 S.W.3d 379, 385 (Tex. App.—Houston [14th Dist.] 2007, no pet.).

### b. Application of the Law to the Facts

The bank's supplemental summary judgment motion challenged every element of fraud. And, as to fraud by nondisclosure, the motion asserted that John had "no evidence of an omission or non-disclosure that [the bank] had a duty to disclose" to him.

John argues that the bank made misrepresentations and fraudulent nondisclosures concerning (i) the loan modification agreements (LMAs) he signed in June 2011 and (ii) the line of credit he opened in October 2011. We consider each in turn.

–18–

### (1)    The LMAs

John says the bank told him that signing the LMAs would not change his guaranties besides extending the loans' terms. This was false, John argues, because the bank actually believed the LMAs "reset" his guaranties' caps to the full amounts, as if John had made no payments as guarantor. But as support, John cites only the LMA documents themselves. And they do not support his argument.

John also says the bank fraudulently failed to disclose its position that the LMAs "reset" his guaranties to their original amount. But his response to the bank's no-evidence motion had to produce evidence of facts that would have imposed on the bank a duty to disclose. *See Myre*, 307 S.W.3d at 843 ("In the absence of a duty to disclose, however, a failure to disclose does not constitute fraud."). John, however, identifies no evidence of a misleading statement by the bank or any other fact that would have imposed a duty to disclose. Thus, he did not meet his summary judgment burden.

Accordingly, we conclude that John adduced no evidence of a false misrepresentation or fraudulent nondisclosure concerning the LMAs.

### (2)    The Line of Credit

As to the October 2011 line of credit, John says he adduced evidence of the following material misrepresentations, plus one bank nondisclosure:

- John's payments to the bank were being applied to the guaranties.

- The bank would allow monthly payments over a ten-year period.

- The bank would not sell his pledged stock to pay down the line of credit.

- Any loss on the line of credit could be paid over a ten-year period.

- Draws would be limited to the amount of the current limited guaranties on each loan.

- The bank failed to disclose its contention that the LMAs had modified the guaranties.

–19–

Regarding the first alleged misrepresentation, John cites as support only the February 2009 email from the bank to Chris discussed above.

John, however, cites no evidence that he relied on that email to Chris when John opened the line of credit. Although his affidavit says, "At the time [I opened the line of credit], I didn't think we owed hardly anything and since the note was only to be used on any remaining balance, I did not see the harm in entering into the agreement," he did not say that any bank communication prompted his belief. Elsewhere, John's affidavit says that Chris forwarded the above 2009 email to John, but it does not say when that happened. Thus, John produced no evidence that he relied on the email when he opened the line of credit.

We consider the next three alleged misrepresentations together. They all appear in a 28 October 2011 letter from the bank to John and Chris. The letter says that the bank has approved a line of credit with the following terms:

| Borrower: | John C. Ganter |
| Amount: | $450,000 line of credit |
| Rate: | 6.5% |
| Fees: | None |
| Repayment: | Interest only monthly (see below for further explanation) |
| Collateral: | 6952 shares of UPS stock (using today's price of $71.93) |
| Maturity: | One year (see below for further explanation) |

Below that, the letter says:

> Once the line is fully drawn, the bank would allow monthly payments to be made over a 10 year period. . . . Stock will not be sold to make the payments.
> The benefits of this transaction are:
> 1. Any loss on the sale of the properties can be paid over a 10 year period[.]

(Emphasis omitted.) John argues that these statements are evidence of fraud.

For reliance evidence, John cites two paragraphs in his affidavit. But these paragraphs do not show that he relied on those statements, or on the letter as a whole. Indeed, his affidavit does

–20–

not mention the letter at all, much less say that he relied on it. John thus produced no evidence that he relied on the letter.

The next alleged misrepresentation is a statement in an 18 October 2011 email from the bank to Chris about the proposed line of credit in which the bank wrote: "Draws would be limited to the amount of the current limited guaranties on each loan." But again, John cites no evidence that he relied on this statement, or that he even knew about it.

Finally, we consider John's claim that the bank failed to disclose to him its contention that the LMAs modified the guaranties. Faced with the bank's no-evidence motion, John had to produce evidence sufficient to raise a genuine fact issue that the bank owed him a duty to disclose this fact when he executed the line of credit documents. His appellate brief, however, does not identify any such evidence.

### (3) Conclusion

For the above reasons, we conclude that the trial court did not err by granting no-evidence summary judgment on John's fraud and fraud by nondisclosure claims.

### 4. Was summary judgment proper on John's negligent misrepresentation claim?

John's third amended petition alleged one specific representation underlying his negligent misrepresentation claim: "[The bank] represented that John Ganter needed to take out a $450,000 line of credit to cover debts (personal guaranties) that were, in actuality, already satisfied."

The bank sought summary judgment on this and other claims based on the affirmative defenses of release, res judicata, collateral estoppel, and a statute of repose.[8] John challenges each affirmative defense in turn.[9]

---

[8] The bank now asserts that summary judgment was proper on John's negligent misrepresentation claim because (i) there is no evidence that his guaranties were satisfied, and (ii) the evidence defeats the essential element of reliance. The bank's summary judgment motions, however, did not expressly assert these grounds against John's negligent misrepresentation claim, so we cannot consider them on appeal. *See Tempay, Inc.*, 2016 WL 192596, at *3 ("[W]e may not affirm . . . a summary judgment on grounds that were not raised in the motion . . . .").

–21–

### a. Release

The bank argued two releases as affirmative defenses. First, it relied on a release found in a November 2012 settlement agreement between it and Chris that settled a separate Collin County lawsuit between the bank and Chris. Second, it relied on releases found in the LMAs John signed. We disagree with both arguments.

### (1) Chris's Release

John makes several arguments regarding the bank's premise that Chris's release barred John's claims. One is that John is not bound by that release because he was not a party to it. We agree.

A release is a contract. *Leighton v. Rebeles*, 399 S.W.3d 721, 725 (Tex. App.—Dallas 2013, no pet.). A contract generally is not binding on a nonparty. *See Sitaram v. Aetna U.S. Healthcare of N. Tex., Inc.*, 152 S.W.3d 817, 825 (Tex. App.—Texarkana 2004, no pet.) ("It is fundamental that a contract is not binding on a nonparty."); *Standard Oil Co. of Tex. v. Donald*, 321 S.W.2d 602, 606 (Tex. Civ. App.—Fort Worth 1959, writ ref'd n.r.e.) ("[A] party is bound, if at all, by his own contract, and not by one made by others.").

We see no basis to hold that John is bound by Chris's release in a settlement agreement solely between Chris and the bank. Accordingly, we conclude that Chris's release does not support the summary judgment on John's negligent misrepresentation claim.

### (2) Releases in the LMAs

Next we consider the releases in the seven LMAs[10] John signed. John first argues that the releases did not bar his negligent misrepresentation claim because he signed the LMAs before

---

[9] John also argues that the trial court erred by granting a no-evidence summary judgment on his negligent misrepresentation claim. The argument is misplaced because the bank did not seek a no-evidence summary judgment as to this claim.

[10] The bank asserts, and John does not appear to dispute, that there were only seven LMAs because the eighth loan was not renewed; instead the bank foreclosed on the collateral.

the bank made the misrepresentations regarding the line of credit. This concerns the releases' scope.

To release a claim, the releasing instrument must "mention" the claim to be released. *Garza v. Bunting*, No. 05-06-01307-CV, 2007 WL 1545937, at *4 (Tex. App.—Dallas May 30, 2007, no pet.) (mem. op.) (citing *Victoria Bank & Trust Co. v. Brady*, 811 S.W.2d 931, 938 (Tex. 1991)). Claims not clearly within the release's subject matter are not discharged, even if they exist when the release is executed. *Id.* Although releases generally contemplate claims existing at the time of execution, a valid release may also encompass future and unknown claims. *Id.* (citing *Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 20 S.W.3d 692, 698 (Tex. 2000)).

Here, each LMA had an effective date in May 2011. In six LMAs, John released the bank from any and all claims "known or unknown, past or present . . . *occurring prior to the Date Hereof* and arising out of or with respect to the transactions or occurrences which are the subject matter of this Modification." (Emphasis added.) These releases unambiguously apply only to claims that existed when the LMAs were executed.

The seventh LMA, concerning a borrower named Greg Kelley, released the bank from any and all claims "whether known or unknown, whether asserted or unasserted as of the date hereof . . . which [John] may now or hereafter have against [the bank] on account of any matter relating in any way to the Loan." Assuming this release linguistically covers future arising claims regarding the Kelley loan because of the phrase "or hereafter," prospective releases of claims for future negligence must also satisfy the express negligence test. *See Dresser Indus., Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 507–09 (Tex. 1993) (fair notice requirements of conspicuousness and express negligence apply to releases that relieve a party in advance of responsibility for its own negligence). Thus, a release will not effectively release claims for

–23–

future negligence unless the release expresses that intent in specific terms. *See Ethyl Corp. v. Daniel Constr. Co.*, 725 S.W.2d 705, 708 (Tex. 1987) ("The express negligence doctrine provides that parties seeking to indemnify the indemnitee from the consequences of its own negligence must express that intent in specific terms."). Because this release does not expressly release negligent misrepresentation claims that arise in the future, it does not release any such claims.

Because the LMA releases cover only negligent misrepresentation claims that arose before the releases' effective dates, the question is whether the bank conclusively proved that John's negligent misrepresentation claim occurred before May 2011. We conclude that it did not.

"The elements of negligent misrepresentation are (1) the defendant made a representation in the course of its business or in a transaction in which it had an interest, (2) the defendant supplied false information for the guidance of others in their business, (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information, and (4) the plaintiff suffered pecuniary loss by justifiably relying on the representation." *Ostrovitz & Gwinn, LLC v. First Specialty Ins. Co.*, 393 S.W.3d 379, 397 (Tex. App.—Dallas 2012, no pet.).

Here, John's negligent misrepresentation claim concerns the line of credit loan agreement, dated 31 October 2011—a few months after he signed the releases. Thus, John's claim could be based on representations made after he signed the releases. And his signing of the loan agreement, which was his act of detrimental reliance on the negligent misrepresentation, was after the releases' effective date. Accordingly, the bank did not conclusively prove that the releases cover John's negligent misrepresentation claim and summary judgment on John's negligent misrepresentation claim cannot be affirmed based on the LMA releases.

### b. Res Judicata and Collateral Estoppel

The bank asserted res judicata and collateral estoppel arising from Chris's lawsuit with the bank as summary judgment grounds. John contests those grounds because he was not in privity with Chris. As to res judicata, John also argues that the bank did not prove an identity of claims. We agree that res judicata and collateral estoppel do not support the summary judgment on negligent misrepresentation.

### (1) Applicable Law

Res judicata's elements are (i) a prior final determination on the merits by a court of competent jurisdiction, (ii) identity of the parties or those in privity with them, and (iii) a second action based on the same claims as were or could have been raised in the first action. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010).

There is, however, no universal definition of privity for res judicata purposes. *Porterfield v. Cenlar FSB*, No. 05-14-00663-CV, 2016 WL 1019359, at *5 (Tex. App.—Dallas Mar. 15, 2016, no pet.) (mem. op.). "A person may be in privity with a party in at least three ways: (1) he can control an action even though not a party to it; (2) his interests can be represented by a party to the action; or (3) he can be a successor in interest deriving his claim through a party to the prior action." *Id*. (citing *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 653 (Tex. 1996)). "Privity does not exist merely when persons are interested in the same question, but requires an identity of interest in the legal right actually asserted." *Tex. Real Estate Comm'n v. Nagle*, 767 S.W.2d 691, 694 (Tex. 1989).

The elements of collateral estoppel are (i) the facts sought to be litigated were fully and fairly litigated in a prior action, (ii) those facts were essential to the judgment in the first action, and (iii) the parties were cast as adversaries in the first action. *Weaver & Tidwell, L.L.P. v. Guar. Co. of N. Am. USA*, 427 S.W.3d 559, 573–74 (Tex. App.—Dallas 2014, pet. denied). The

party against whom collateral estoppel is asserted must have been a party or in privity with a party in the first action. *MGA Ins. Co. v. Charles R. Chesnutt, P.C.*, 358 S.W.3d 808, 817 (Tex. App.—Dallas 2012, no pet.).

### (2) Application of the Law to the Facts

The bank's evidence showed that it sued Chris in Collin County in 2012. Chris answered and counterclaimed. His counterclaims included claims relating to his limited guaranties of the Townhome Loans. The case settled, and the court dismissed the case with prejudice in November 2012. The bank argued that this judgment precluded John's claims in this case.

The bank's only privity argument was that Chris jointly owned the joint bank account and that John authorized him to use funds in the account to pay the Townhome Loans. Thus, the bank did not argue that John controlled the Collin County suit or that he was a successor in interest to Chris. We thus consider only whether the bank conclusively showed that Chris represented John's interests, which John denies. We agree with John.

Chris's Collin County pleading addressed only Chris's limited guaranties, not John's. Specifically, Chris (who had other debts to the bank) asserted that the bank improperly applied Chris's funds to the Townhome Loans far in excess of the amounts stated on Chris's limited guaranties. He did not, however, claim that the funds he deposited should have been applied to John's limited guaranties.

We see no evidence that Chris represented John's interests in that case. Thus the bank did not conclusively prove that Chris was in privity with John as to the Collin County suit. *See Brown v. Zimmerman*, 160 S.W.3d 695, 703–04 (Tex. App.—Dallas 2005, no pet.) (corporation not in privity with its founder and president without evidence that founder acted for or by authority of corporation in prior lawsuit).

–26–

The bank's reliance on *Grimm v. Rizk*, 640 S.W.2d 711 (Tex. App.—Houston [14th Dist.] 1982, writ ref'd n.r.e.), is misplaced. In that case, the appellants sued the appellees for wrongfully foreclosing on an apartment complex the appellants invested in. *Id*. at 713. Previously, a different person named William Upchurch had filed virtually the same suit against most of the same defendants and lost on summary judgment. *Id*. at 714. The appellees won summary judgment based on res judicata, and the court of appeals held that Upchurch was in privity with the appellants for res judicata purposes. *Id*. at 714–16. The court of appeals relied on several facts to support that result: (i) Upchurch filed his suit as trustee, and he was trustee for each of the appellants, (ii) Upchurch was also the appellants' partner and agent, (iii) Upchurch had no individual interest in the purchase of the apartments and acted in a representative capacity at all times, and (iv) any recovery by Upchurch would have reverted to appellants' benefit. *See id*. at 715–16. Here, however, Chris's individual interests were at risk in the Collin County suit, he did not purport to act in a representative capacity, and there is no evidence that any relief he obtained in the Collin County suit would have benefitted John. Thus, *Grimm* is distinguishable.

We therefore conclude that the bank did not conclusively prove privity, and thus that neither res judicata nor collateral estoppel supports summary judgment on the negligent misrepresentation claim.

### c. Statute of Repose

The bank argued that business and commerce code § 4.406(f)'s statute of repose entitled it to summary judgment. But we agree with John that § 4.406(f) does not apply here.

Section 4.406(f) establishes a one-year time limit for a bank customer to bring certain claims:

> Without regard to care or lack of care of either the customer or the bank, a customer who does not within one year after the statement or items are made available to the customer . . . discover and report the customer's unauthorized

–27–

signature on or any alteration on the item is precluded from asserting against the bank the unauthorized signature or alteration.

TEX. BUS. & COM. CODE § 4.406(f).

John argues that his negligent misrepresentation claim does not trigger § 4.406(f) because it does not involve an unauthorized signature on, or an alteration of, an item. Rather, his claim concerns the bank's allocations of funds withdrawn from the joint account. We agree.

The bank did not conclusively prove that John's negligent misrepresentation claim was barred by § 4.406(f), so the summary judgment cannot stand based on that ground.

### d.      Conclusion

Since the bank did not conclusively establish an affirmative defense to John's negligent misrepresentation claim, the trial court erred by granting summary judgment on that claim.

### 5.      Was summary judgment proper on John's quantum meruit and money had and received claims?

John's third amended petition pled that he overpaid the bank under facts supporting a quantum meruit recovery. It also alleged that the bank held money that in equity and good conscience belonged to John under a money had and received claim.

### a.      The Summary Judgment Grounds

John argues that the bank's summary judgment motions did not attack any specific elements of quantum meruit or money had and received. He further argues that the bank's summary judgment grounds as to these claims were instead limited to the affirmative defenses discussed above regarding his negligent misrepresentation claim. Thus, we must first identify the grounds the bank actually asserted against those claims.

John argues, and we agree, that the bank did not purport to conclusively negate any element of either claim. As discussed above, the bank's motions do not identify the applicable elements or assert that the evidence conclusively negates any such element. Rather, the bank's original summary judgment motion contains the heading "Fraud, Negligent Misrepresentation,

–28–

Quantum Meruit, Money Had and Received," under which it mentions a "Disclaimer of Oral Agreements" that John executed. But the motion does not go on to assert that the disclaimer defeats any particular element of either claim. We therefore conclude that the bank's only summary judgment grounds attacking these claims were the affirmative defenses discussed above: release, res judicata, collateral estoppel, and business and commerce code § 4.406(f).

### b. Analysis of the Bank's Affirmative Defenses

The next question is whether the bank conclusively established an affirmative defense to John's quantum meruit and money had and received claims.

For the reasons already stated regarding John's negligent misrepresentation claim, we conclude that Chris's release, res judicata, collateral estoppel, and § 4.406(f) cannot support summary judgment regarding John's quantum meruit and money had and received claims.

But the bank's release arguments require a separate analysis. As we discussed above regarding John's negligent misrepresentation claims, the question here is whether the bank conclusively proved that John's quantum meruit and money had and received claims occurred before their May 2011 effective dates. We conclude that the bank did not.

Under quantum meruit, John alleged that the bank received an "overpayment" and refused to return it, but he did not allege when this overpayment occurred, nor did the bank conclusively establish that fact. Similarly, under money had and received, John alleged that the bank "improperly obtained and handled funds from [John] and improperly directed that money to [itself]," but the bank did not conclusively prove when this happened. These events may have occurred after John executed the line of credit agreement in October 2011. Accordingly, the bank did not conclusively prove that these releases in the first six LMAs mentioned John's quantum meruit and money had and received claims, and those releases do not support summary judgment on those claims.

–29–

But the seventh LMA, concerning borrower Greg Kelley, contained a different release provision. In that document, John released the bank from any and all claims "whether known or unknown, whether asserted or unasserted as of the date hereof . . . which [John] may now *or hereafter* have against [the bank] on account of any matter relating in any way to the Loan." (Emphasis added.) We will assume without deciding that this clause released the bank prospectively from future claims as long as they related to the original loan to Kelley. But the express negligence test, which applied to John's negligent misrepresentation claim, does not apply to quantum meruit or money had and received. *See English v. BGP Int'l, Inc.*, 174 S.W.3d 366, 375 (Tex. App.—Houston [14th Dist.] 2005, no pet.) ("[T]he express negligence doctrine does not apply to non-negligent actions.").

The question regarding John's quantum meruit and money had and received claims is whether they relate "in any way" to the original Kelley loan. We conclude that the bank did not conclusively establish that they do because John's quantum meruit and money had and received claims do not specifically mention the Kelley loan. They instead refer back to the pleading's prior allegations, which include allegations about all eight loans. Under these pleadings, John may be able to prove these claims without referring to the Kelley loan. Thus, we conclude that the bank did not meet its summary judgment burden on its release affirmative defense.

### c.    The Bank's Other Arguments

The bank presents several other arguments that John's quantum meruit and money had and received claims have no validity.[11] Because the bank did not assert these grounds in its summary judgment motions, we cannot consider them here. *See Tempay, Inc.*, 2016 WL

---

[11] Specifically, the bank posits that the quantum meruit claim fails because (i) quantum meruit cannot apply to a claim that someone overpaid a loan, (ii) the evidence conclusively proves John had no expectation of repayment, and (iii) quantum meruit is not available because express contracts cover the subject matter of his claim. The bank then says that the money had and received claim fails for the same reasons.

192596, at *3 ("[W]e may not affirm . . . a summary judgment on grounds that were not raised in the motion . . . .").

### d. Conclusion

For the foregoing reasons, the trial court erred by granting summary judgment on John's quantum meruit and money had and received claims.

### 6. Was summary judgment proper on John's declaratory judgment claims?

John's live pleading sought three declarations:

1. The line of credit loan agreement and all associated assignments are void for fraud;

2. the bank, as successor by merger to United Community Bank, N.A., is liable for United's fraudulent actions;

3. John's guaranties were satisfied before he entered the line of credit loan agreement and related assignments.

John argues that the bank's motions failed to attack his declaratory judgment claims. We disagree. The bank's original summary judgment motion asserted that the bank's affirmative defenses defeated John's then-asserted declaratory judgment claims (among other claims) to the extent that John asserted that the bank should have allocated Chris's payments from the joint account to John's limited guaranties. Accordingly, we review the bank's affirmative defenses regarding John's declaratory judgment claims.

As stated above, the bank's affirmative defenses rest on Chris's release, John's LMA releases, res judicata, collateral estoppel, and business and commerce code § 4.406(f).

For the same reasons discussed above regarding John's negligent misrepresentation claim, we conclude that the defenses based on Chris's release, res judicata, collateral estoppel, and § 4.406(f) cannot support summary judgment as to any of John's declaratory judgment claims.

We further hold that John's own LMA releases do not conclusively bar all of his declaratory judgment claims. As discussed above, six of the seven LMAs release only existing claims. The requested declarations at least potentially concern post-release events. The bank, however, did not conclusively prove that John's declaratory judgment claims concern only pre-release events.

The seventh LMA, however, releases post-release claims, but only if they relate to the original Kelley loan. John's first two requested declarations do not refer or relate to the original Kelley loan, so they are not barred by the release in the Kelley LMA. But his third requested declaration, that his guaranties were satisfied before he entered the line of credit loan agreement, does relate, in part, to the original Kelley loan. That is, to the extent John seeks a declaration that his limited guaranty of the Kelley loan was satisfied before he entered into the line of credit loan agreement, his claim relates to the Kelley loan, and he released that claim in the Kelley LMA.

Our conclusion that John released one of his declaratory judgment claims requires us to address his argument that the LMA releases are invalid because they were fraudulently induced. But the bank's supplemental summary judgment motion made a no-evidence attack on John's fraudulent inducement defense along with his fraud claims, and we have already concluded that John failed to show that the no-evidence summary judgment on his fraud theories was erroneous. Thus, we are not persuaded by John's argument.

John also argues that the releases are invalid based on equitable estoppel. But he provides no supporting record references, so the argument presents nothing for us to review. *See Bolling v. Farmers Branch Indep. Sch. Dist.*, 315 S.W.3d 893, 896 (Tex. App.—Dallas 2010, no pet.) ("If record references are not made . . ., the brief fails."). Even if we were to consider the argument, John argues that equitable estoppel requires proof of, among other things, either a

–32–

false representation or a concealment of material facts. We have already concluded John produced no evidence of these facts regarding the LMAs. So his equitable estoppel argument fails.

Finally, the bank now argues that John's declaratory judgment claims are invalid because they are derivative of and subsumed by his other claims. But the bank did not assert this ground in its summary judgment motions, so we cannot consider it. *See Tempay, Inc.*, 2016 WL 192596, at *3.

Accordingly, we conclude that (i) the trial court did not err by granting summary judgment as to John's claim for a declaratory judgment that his limited guaranty of the Kelley loan was satisfied before he entered the line of credit loan agreement and related assignments but (ii) did err by granting summary judgment as to his other requests for declaratory relief.

### 7. Conclusion

We sustain John's first two issues in part and overrule them in part. We conclude that the trial court erred by granting summary judgment on John's claims for contract breach, negligent misrepresentation, quantum meruit, and money had and received. The trial court did not err by granting summary judgment as to John's claims for fraud and fraud by nondisclosure. The trial court erred by granting summary judgment on John's declaratory judgment requests, with the exception that the trial court did not err by granting summary judgment as to his claim for a declaratory judgment that his Kelley loan limited guaranty was satisfied before he entered into the line of credit loan agreement and related assignments.

**B.      Issues Three and Four:  Did the trial court err by granting summary judgment for the bank on its counterclaim?**

The bank counterclaimed against John for defaulting on his line of credit promissory note. The bank's attorneys' fees request was the only relief it sought when it moved for summary judgment on its counterclaim. The evidence indicates that the bank liquidated the

–33–

collateral John had pledged, and the proceeds were enough to pay the principal and interest due under the note, leaving only attorneys' fees and collection expenses to be recovered. The trial court granted the bank's motion, awarding it almost $154,000 in attorneys' fees and expenses, plus conditional appellate fees.

John's third issue argues that the bank did not conclusively establish its counterclaim because it failed to conclusively prove (i) the amount due and owing on the note or (ii) the amount of attorneys' fees to which it was entitled. And, alternatively, his fourth issue argues that he raised genuine fact issues on his affirmative defenses. For the following reasons, we sustain John's third issue.

### 1. Did the trial court err by holding that the bank carried its summary judgment burden?

"To recover on a promissory note, the plaintiff must prove: (1) the note in question, (2) the party sued signed the note, (3) the plaintiff is the owner or holder of the note, and (4) a certain balance is due and owing on the note." *Manley v. Wachovia Small Bus. Capital*, 349 S.W.3d 233, 237 (Tex. App.—Dallas 2011, pet. denied).

John argues that the bank did not conclusively prove the amount due and owing on the note. The bank relied on employee Karen Adams's affidavit, in which she authenticated a copy of the note and then testified to the amount due under the note as follows:

> 5. [John] failed to make payments on the Note according to the terms of the Note, and the Note has matured. . . .
>
> 6. [John] has failed and refused to pay said Note, and has continued to refuse and [sic] to pay said Note. As of November 16, 2012, the unpaid balance of the Note was $302,249.71 principal plus accrued interest, late charges and attorney fees. . . .
>
> 7. In accordance with the provisions of the Note, Loan Agreement and Assignment of Investment Property/Securities, the stock pledged as collateral to pay the Note was sold and the proceeds applied to pay principal and accrued interest. After granting all offsets, credits, and setoffs to which [John] is entitled,

–34–

> [John] owes [the bank] all costs of collection expenses and attorney fees as provided in paragraph 9 of the Loan Agreement.

Thus, the Adams affidavit purported to establish the amount due and owing on the Note after its maturity date (31 October 2012) and before the collateral was sold and applied to the balance.

But John argues that he raised a genuine fact issue as to whether any amount was due and owing because he adduced more than a scintilla of evidence that he did not owe any money on his limited guaranties when the bank drew down his line of credit, thereby purportedly imposing liability on John under the related note. We agree.

We have already discussed the evidence presented in Chris's affidavit and the bank's February 2009 email indicating that the DDA funds the bank received were payments against John's limited guaranties. The evidence raises a genuine fact issue as to whether John actually owed the bank any money under the guaranties when he executed the line of credit documents. And, if John did not owe any money on the guaranties at that time, the bank was not entitled to draw down John's line of credit and impose liability on him through the related note.

We thus conclude the bank did not conclusively establish John's liability for breach of contract.

### 2. Conclusion

We sustain John's third issue and therefore need not discuss his fourth issue. The trial court erred by granting summary judgment for the bank on its counterclaim.

## V. DISPOSITION

We reverse the trial court's judgment in part and affirm it in part.

We reverse the judgment to the extent it ordered John to take nothing on his claims for contract breach, negligent misrepresentation, quantum meruit, and money had and received.

We also reverse the judgment to the extent it denied John's declaratory judgment claims, with the exception that we affirm the denial of John's request for a declaratory judgment that his

limited guaranty of the Kelley loan was satisfied before John entered the line of credit loan agreement and related assignments.

And we reverse the judgment to the extent it granted summary judgment in the bank's favor on its counterclaim.

We affirm the remainder of the trial court's judgment and remand the case for further proceedings consistent with this opinion.

/Bill Whitehill/
BILL WHITEHILL
JUSTICE

150413F.P05



# Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

JOHN C. GANTER, Appellant

No. 05-15-00413-CV          V.

INDEPENDENT BANK, F/K/A UNITED
COMMUNITY BANK, N.A., Appellee

On Appeal from the 298th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. 12-13675.
Opinion delivered by Justice Whitehill.
Justices Lang and Brown participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED** in part and **REVERSED** in part as follows.

We **REVERSE** that portion of the trial court's judgment that orders appellant John C. Ganter to take nothing on his claims for breach of contract, negligent misrepresentation, quantum meruit, and money had and received.

We also **REVERSE** the judgment to the extent it denies appellant John C. Ganter's declaratory judgment claims, with the exception that we affirm the denial of appellant John C. Ganter's request for a declaratory judgment that his limited guaranty of the Kelley loan was satisfied before appellant John C. Ganter entered the line of credit loan agreement and related assignments.

We also **REVERSE** that portion of the trial court's judgment granting summary judgment in favor of appellee Independent Bank, f/k/a United Community Bank, N.A. on its counterclaim.

In all other respects, the trial court's judgment is **AFFIRMED**. We **REMAND** this cause to the trial court for further proceedings consistent with the opinion.

It is **ORDERED** that each party bear its own costs of this appeal.

Judgment entered August 16, 2016.